_____

No. 95-3506

_____

Henry N. Tidwell; Herman L.          *
Muldrow,                             *
                                     *
          Appellees,                 *
                                     *
     v.                              *
                                     *
Meyer's Bakeries, Inc.,              *
                                     *
          Appellant.                 *

_____                          Appeal and Cross-Appeal
                                     from the United States
No. 95-3507                          District Court for the
_____                          Western District of Arkansas.

Henry N. Tidwell,                    *
                                     *
          Appellant,                 *
                                     *
Herman L. Muldrow,                   *
                                     *
          Plaintiff,                 *
                                     *
     v.                              *
                                     *
Meyer's Bakeries, Inc.,              *
                                     *
          Appellee.                  *

_____

Submitted:  April 10, 1996

Filed:  August 21, 1996
_____

Before MAGILL, Circuit Judge, HENLEY, Senior Circuit Judge, and
     LOKEN, Circuit Judge.

_____

MAGILL, Circuit Judge.

Henry N. Tidwell, an African-American, worked as a production supervisor at Meyer's Bakeries, Inc. Following a work schedule change that Tidwell perceived to be a demotion, he quit his job. Shortly thereafter, he brought suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, and under the Civil Rights Act of 1991, 42 U.S.C. § 1981, against Meyer's, claiming that Meyer's' employment practices were racially discriminatory and resulted in his constructive discharge.

The jury returned a verdict in favor of Tidwell and awarded him $34,470 in back pay. The district court, through a subsequent order, awarded Tidwell front pay and attorney's fees. On appeal, Meyer's challenges the verdict, claiming that as a matter of law there was insufficient evidence upon which the jury could conclude that its working environment was so intolerable that it compelled Tidwell to quit. Tidwell cross-appeals, challenging the district court's calculation of front pay damages and attorney's fees. We agree with Meyer's and reverse.

## I.

Meyer's Bakeries, Inc. is a family-owned business based in Little Rock, Arkansas. It produces bread products which are sold to customers throughout the United States. Meyer's' customers repackage the products and sell them under various private labels. Meyer's provides English muffins to McDonald's Restaurants and English muffins and bread sticks to Sam's Club. III Trial Tr. at 579.

Meyer's has a baking facility located in Hope, Arkansas, that produces English muffins, bread, and "brown and serve" rolls. The Hope bakery is divided into five departments, one of which is production. As the name suggests, the production department mixes

-2-

the dough, operates the ovens, and oversees the packaging of the finished product. The production department at the Hope bakery is divided into three operations that correspond to the three products baked there: muffins, bread and "Lanham." The Lanham operation produces the "brown and serve" rolls.

Each production line has a shop division and a wrap division, each with a supervisor. The shop supervisor works at the beginning of the production line, overseeing the mixing of the dough and generally ensuring that the dough moves smoothly onto the baking line. The wrap supervisor works at the end of the production line where the finished product is packaged and boxed. Generally, shop and wrap supervisors on each line are paired together, sharing the same work schedule.

Operating at a normal production rate, Meyer's has one Lanham shift per day. During the "rush" periods in the months leading up to Christmas and Easter, Meyer's will run up to four Lanham shifts each day. The Christmas rush begins in August and lasts for approximately three months.

Because of the surge in personnel needs during rush periods, Meyer's typically rearranges employee schedules. Some supervisors are switched to different shifts and temporary supervisors are assigned to fill the empty slots. The assistant plant manager, Mike Nelson, made staffing decisions for production supervisors. IV Trial Tr. at 635.

From 1991 to 1993, over fifty percent of the production workers in Hope were African-American. Out of the twelve production supervisors in Hope in 1987, four were African-American. By 1993, the number of production supervisors had increased to eighteen of which eight were African-Americans. Few African-Americans occupied management positions above the level of production supervisor, however.

Tidwell was employed by Meyer's on a full-time basis in the production department of the Hope bakery from October 27, 1978 until September 25, 1993. For the first eight years of his employment, Tidwell worked as a production worker, spending time on all three production lines. In June 1986, Tidwell worked as a temporary wrap supervisor for first shift Lanham. After Christmas rush, Tidwell became a full-time production supervisor. As a production supervisor, Tidwell changed shift and line with some regularity.

Initially, Tidwell was assigned as the wrap supervisor of second shift muffins. When the 1987 Christmas rush season began, Tidwell was sent to first shift Lanham, where he had been stationed the prior year. After the 1987 Christmas rush period was over, Tidwell went back to second shift muffins. He went back to first shift Lanham during the 1988 Christmas rush and remained there through the 1989 Christmas rush period. He then went back to second shift muffins and, in addition, he began filling in for other supervisors on vacation and wherever he was needed. David Overstreet, a white production worker who had been promoted to production supervisor earlier that year, replaced Tidwell as first shift Lanham wrap supervisor.

When the 1990 Christmas rush began, Tidwell was assigned to second shift Lanham and, after the rush, he went back to second shift muffins. Again in 1991 he worked second shift Lanham and returned to supervising the muffin line following Christmas rush. Prior to the start of the 1992 rush, Tidwell told the production manager that he preferred to remain with second shift muffins and wanted to avoid second shift Lanham during the Christmas rush period because he disliked supervising the untrained workers on second shift Lanham. II Trial Tr. at 134. After Overstreet left Meyer's, the production manager told Tidwell that he would be given his choice of shifts if he agreed to return to the Lanham line. Tidwell agreed and chose to serve as first shift Lanham wrap

-4-

supervisor.   After the 1992 Christmas rush, Tidwell remained on first shift Lanham as the wrap supervisor until August 22, 1993.

During this period, Mike Bishop, an African-American assistant production superintendent, told Tidwell that the bakery would be hiring a new assistant production superintendent and that he had recommended Tidwell and Mark Smithers, a white production supervisor, for the job.[1]  Bishop also allegedly told Tidwell that he thought that Tidwell would not be selected because Meyer's would not want two African-American assistant production superintendents at the Hope bakery.[2]

At the time Meyer's was considering who to promote, Smithers was already serving as a temporary assistant production superintendent.  IV Trial Tr. at 713.  Still, Tidwell believed he and Smithers were equally qualified candidates.  Meyer's offered Smithers the job.[3]  When Tidwell congratulated Smithers on the promotion, Smithers told him that "Lanham is yours so long as you are with the company."  II Trial Tr. at 150.  Tidwell understood Smithers to mean that he would be the permanent, first shift Lanham wrap supervisor.

In August 1993, four supervisory positions were eliminated in a downsizing which resulted in a reassignment of supervisors. Under the new schedule, no wrap supervisor was assigned to any particular department.  Tidwell was assigned to work "relief" along

---

[1]The bakery production manager, Beryl Freeman, was responsible for promotion decisions in the production department.  Freeman, however, sought Bishop's assistance in evaluating the abilities of the lower level employees.

[2]Bishop denied making this statement to Tidwell.  IV Trial Tr. at 743-44.

[3]Tidwell later came to believe he was the better qualified candidate because he had been employed longer at the bakery and because he had taken an American Institute of Baking course.

with three other wrap supervisors, filling various time slots and production lines as needed.

On September 25, 1993, Meyer's announced a new schedule to take effect the next day. Tidwell was removed from the all wrap supervisor schedule and assigned to serve as second shift Lanham wrap supervisor. According to the assistant plant manager, Tidwell was assigned to be one of the two second shift Lanham supervisors because Meyer's wanted to pair experienced wrap supervisors, in this case Tidwell, with inexperienced shop supervisors.

Tidwell was upset with the new schedule. Another supervisor, Charles Scisson, questioned the production superintendent, Red Rosenbaum, regarding whether the schedule was accurate. After Rosenbaum determined that the schedule was, in fact, accurate and was to be worked, Tidwell "got up and walked out." II Trial Tr. at 279.

Tidwell testified that he was upset with the newest schedule for several reasons. First, he felt that Smithers had broken a promise to allow Tidwell to stay with first shift Lanham. As Tidwell testified, "when Mr. Smithers got his promotion [he told me] that Lanham was mine as long as I was with the company." Second, Tidwell testified that he did not want to supervise second shift production workers, who tended to be less experienced or less motivated. Third, he believed that this "demotion" to the second shift represented another example of Meyer's' discriminatory employment practices.[4] On the September 26, 1993 schedule,

_____

[4]Tidwell had made earlier complaints about Meyer's' racially discriminatory scheduling practices to the bakery production manager and the assistant production superintendent. In July 1993, Tidwell and four other African-American production supervisors filed a race discrimination charge against Meyer's with the Equal Employment Opportunity Commission, claiming that the production supervisor shift assignments were determined in a racially discriminatory manner.

Charlotte Bobo, a white supervisor, was assigned first shift Lanham wrap supervisor. Bobo had less experience than Tidwell and he viewed her assignment to first shift Lanham wrap supervisor as a promotion of a white employee over a more qualified African-American employee.

Tidwell never inquired as to the reasons for Bobo being placed on first shift Lanham nor did he inform anyone in management that he believed that he had been promised an assignment to that shift as long as he worked for the company or that he believed he had been denied the shift assignment because of his race.

After walking off the job on September 25, 1993, Tidwell had no further contact with Meyer's. On October 27, 1993, he filed a second charge of discrimination against Meyer's with the Equal Employment Opportunity Commission (EEOC). The EEOC refused to take action itself, but issued a right to sue letter. Tidwell filed suit in federal court on March 7, 1994, alleging unlawful race discrimination and constructive discharge. After a four-day trial, the jury returned a verdict in favor of Tidwell.

Meyer's moved for judgment as a matter of law at the close of plaintiff's evidence and after the jury returned its verdict. The district court denied both motions. Meyer's appeals, arguing that, as a matter of law, there was insufficient evidence upon which a reasonable jury could conclude that working conditions were so poor for Tidwell that he was compelled to quit his employment. Tidwell cross-appeals, raising two issues. He argues that in awarding front pay, the district court erred in limiting it to two years into the future. He also argues that the district court abused its discretion in reducing counsel's hourly rate and time calculation in determining the attorney's fee award.

## II.

We review de novo the district court's denial of judgment as a matter of law. Amerinet, Inc. v. Xerox Corp., 972 F.2d 1483, 1505 (8th Cir. 1992), cert. denied, 506 U.S. 1080 (1993). "A motion for judgment as a matter of law presents a legal question to the district court and this court on review: 'whether there is sufficient evidence to support a jury verdict.'" Smith v. World Ins. Co., 38 F.3d 1456, 1460 (8th Cir. 1994) (quoting White v. Pence, 961 F.2d 776, 779 (8th Cir. 1992)). We view the evidence in the light most favorable to the prevailing party, giving him the benefit of all reasonable inferences that can be drawn from the evidence. Smith v. Goodyear Tire & Rubber Co., 895 F.2d 467, 471 (8th Cir. 1990). Judgment as a matter of law is appropriate only when all of the evidence points in one direction and is susceptible to no reasonable inference that would sustain the position of the nonmoving party. Id. After a thorough review of the trial record, we conclude that there is insufficient evidence, as a matter of law, to establish that Tidwell was constructively discharged.

To establish a prima facie case of discriminatory discharge, Tidwell must show that (1) he was a member of a protected class, (2) he was capable of performing the job, and (3) he was discharged from the job. See Johnson v. Bunny Bread Co., 646 F.2d 1250, 1253 (8th Cir. 1981); see also Richmond v. Board of Regents of Univ. of Minn., 957 F.2d 595, 598 (8th Cir. 1992) (prima facie case under Title VII and section 1981 are identical). Tidwell has met the first two elements of this test. Because Tidwell was not formally terminated by Meyer's, he must show that he was nevertheless forced to leave Meyer's' employment due to constructive discharge.

To constitute a constructive discharge, the employer must deliberately create intolerable working conditions with the intention of forcing the employee to quit and the employee must quit. See Bunny Bread Co., 646 F.2d at 1256. The plaintiff can

-8-

satisfy the intent requirement by demonstrating that he quit as a reasonably foreseeable consequence of the employer's discriminatory actions. Hukkanen v. International Union of Operating Eng'rs, 3 F.3d 281, 285 (8th Cir. 1993).

A constructive discharge arises only when a reasonable person would find the conditions of employment intolerable. Id. To act reasonably, an employee has an obligation not to assume the worst and not to jump to conclusions too quickly. West v. Marion Merrell Dow, Inc., 54 F.3d 493, 498 (8th Cir. 1995). An employee who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged. Id.

We have looked at the evidence in this case in the light most favorable to Tidwell, and conclude that there is no indication that Meyer's acted with the intention of forcing Tidwell to resign or that Tidwell's resignation was a reasonably foreseeable consequence of Meyer's' actions. While there is evidence that Tidwell was discriminated against on the basis of his race, we hold that there was insufficient evidence to establish that a reasonable person would find the working conditions at Meyer's intolerable. Without this evidence, a finding of constructive discharge cannot be sustained.

Rather than presenting one event as the defining moment in his employment at Meyer's, Tidwell points to a number of incidents and circumstances spread over several years which he claims, taken together, forms a complex tapestry of discrimination. See Appellee's Br. at 12; see also Burns v. McGregor Elec. Indus., Inc., 955 F.2d 559, 564 (8th Cir. 1992) ("[T]he trier of fact must keep in mind that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created may exceed the sum of the individual episodes." (quotation & citation omitted)); Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1083 (3d Cir. 1996) ("discrimination

analysis must concentrate not on individual incidents, but on the overall scenario" (quotation & citation omitted)).

At trial, Tidwell offered evidence that Meyer's acted in a racially discriminatory manner in making shift assignments. White production supervisors were favored for positions on the first shift of all the production lines. Meyer's usually assigned Tidwell to the second shift. Tidwell wanted the first shift Lanham wrap assignment because the workers on the first shift tended to be more experienced and more motivated. His poor shift assignments, Tidwell argues, had the secondary effect of impeding his salary advancement, forcing him to do more hands-on work, and requiring him to work at less desirable times. Supervisors' raises were based on performance evaluations conducted annually, and first shift supervisors were more likely to receive a high evaluation because the workers under them were better. Despite these disadvantages, in 1993 Tidwell was the sixth highest paid production supervisor of the sixteen at the Hope bakery.

Tidwell also claimed that Meyer's failed to promote him to assistant production superintendent because of his race. Bishop allegedly had told Tidwell that he would not be made assistant production superintendent because Meyer's did not want two African-Americans at that management level. Tidwell testified that he believed he was better qualified than Smithers, the white employee who received the position instead. Tidwell had taken an American Institute of Baking course that Smithers had not. Tidwell had also been employed by the bakery longer. Smithers, however, had been working as a production supervisor longer than Tidwell. II Trial Tr. at 150. At the time Meyer's made the promotion decision, Smithers had been serving as a temporary assistant production superintendent.

In situations more egregious than this, where a better qualified employee is repeatedly turned down for promotions in

favor of inferior candidates, we can foresee that a negative and degrading atmosphere sufficient to constitute constructive discharge might exist. In this instance, however, where Tidwell lost a single promotion opportunity to an arguably better qualified candidate, the overwhelming compulsion to quit that is necessary for constructive discharge is not created. As we recently stated in West, 54 F.3d at 498, "frustration and embarrassment at not being promoted do not make work conditions sufficiently intolerable to constitute constructive discharge." See also Maney v. Brinkley Mun. Waterworks & Sewer Dep't, 802 F.2d 1073, 1075-76 (8th Cir. 1986) (African-American plaintiffs who were passed over for a promotion in favor of a less qualified white employee were victims of discrimination, but were not constructively discharged).

According to Tidwell, the straw that broke the camel's back was the announcement of the September 26, 1993 work schedule. This schedule moved him to second shift Lanham wrap. Tidwell wanted, and claimed he had been promised by Smithers, to be permanently staffed as first shift Lanham wrap production supervisor. Objectively, the newly-appointed Smithers promised Tidwell only that Lanham "is yours"; there is no testimony that he ever mentioned a particular shift. II Trial Tr. at 150. In addition, Smithers' statement constitutes a mere hortatory statement which he had no authority to ensure was fulfilled. Work schedules at Meyer's were set by the assistant plant manager, not by assistant production superintendents. IV Trial Tr. at 634.[5]

---

[5]Herman Muldrow, an African-American who worked at Meyer's as a production supervisor and was a co-plaintiff with Tidwell at trial, testified that he overheard Mike Nelson say "I got my HNIC in charge of it" while Nelson was speaking on the telephone to a salesman. III Trial Tr. at 404. According to Muldrow, HNIC stood for "Head Nigger in Charge." Id. at 404-05. Assuming that Muldrow was correct in explaining what HNIC meant, then Nelson overstepped the bounds of acceptable workplace behavior. Because there is no evidence that Tidwell heard or knew of Nelson's comment, however, this instance of insulting, racist language does not create an intolerable workplace for Tidwell.

Even assuming that Smithers had intended to promise Tidwell a slot on first shift Lanham, the unforeseen work force reduction combined with the beginning of Christmas rush forced Meyer's to make significant adjustments in the work schedules. The bakery eliminated four of the sixteen production supervisor positions, a quarter of the employees at that level. As a consequence of this schedule adjustment, Tidwell was required to work second shift Lanham wrap. Dissatisfaction with a work assignment is, as a matter of law, normally not so intolerable as to be a basis for constructive discharge. See Carter v. Ball, 33 F.3d 450, 459 (4th Cir. 1994) ("Dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign.").

Other surrounding circumstances further mitigated the impact of Tidwell's assignment to the second shift. Throughout his career at the bakery, Tidwell had been moved from shift to shift depending on the particular production stresses of the moment. Prior to 1991, when Smithers promised Tidwell he could stay with the Lanham line, Tidwell spent most of his time on second shift Lanham or second shift muffins, moving to first shift only during the Christmas rush season. The schedule posted on September 25, 1993, was a temporary schedule, establishing shift staffing for the next week. II Trial Tr. at 310, 312. At the most, this schedule would have lasted about three months, until the end of the Christmas rush. In addition, there was nothing objectively undesirable about Tidwell's new work hours. On four of his six workdays, his shift started at 11 a.m. and ended at 7 p.m.

The schedule change did not mean a reduction in pay, responsibility, benefits, or job title for Tidwell. Nelson, who is in charge of scheduling, testified that the September 26, 1993 schedule change occurred because the production rate for the Lanham line was too low for rush period. IV Trial Tr. at 619. To achieve

-12-

this goal, Meyer's sought to form supervisor pairs that matched experienced supervisors with relatively inexperienced ones. Tidwell was moved to the second shift to be the senior supervisor.

Nor was Tidwell's assignment to the second shift a harbinger of imminent dismissal or even a sign that he would not be considered for future promotions. Mike Bishop, an African-American assistant production superintendent, had been promoted from production supervisor while he was working primarily on the second and third shifts. IV Trial Tr. at 712. In fact, Tidwell had every reason to believe that Meyer's had confidence in his abilities as a supervisor. The September 26, 1993 schedule came a few months after Tidwell's annual evaluation. In June 1993, Tidwell received a performance rating of 3.6, the highest he had ever received, and the seventh highest rating of the sixteen production supervisors. A performance rating of 3.6 translates into a pay increase of 3.6%.

Furthermore, upon seeing the new schedule, Tidwell did not give Meyer's an opportunity to explain the situation or remedy it. Once he confirmed that the schedule posted on September 25 had been printed correctly and would be implemented the next day, he quit. "Society and the policies underlying Title VII will be best served if, wherever possible, unlawful discrimination is attacked within the context of existing employment relationships." West, 54 F.3d at 498 (quoting Bourque v. Powell Elec. Mfg. Co., 617 F.2d 61, 66 (5th Cir. 1980)). Tidwell's decision to forego any effort at communicating his grievance to Meyer's reinforces the fact that he acted unreasonably when he quit.

What is missing from this catalogue of evidence is any indication that Tidwell faced objectively intolerable working conditions. While the conditions under which Tidwell worked may have been unpleasant and tinged with discriminatory acts, they do not create an intolerable atmosphere that would allow Tidwell's quitting to be considered a constructive discharge.

### III.

For the reasons stated above, we reverse the district court, remand to the district court, and direct that it grant judgment as a matter of law in favor of Meyer's Bakeries. Because Tidwell has failed to establish, as a matter of law, that he was the victim of discriminatory company action that compelled him to quit, we need not decide his cross-appeals on damages and attorney's fees other than to say, as we now do, that on remand the awards for front pay and damages are to be vacated and judgment on such claims entered in favor of Meyer's Bakeries.

A true copy.

Attest:


CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

-14-