# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 96-2534

_____

Andrew Keeper,                          *
                                        *
            Appellant,                  *  On Appeal from the United
States
                                        *     District Court for the
      v.                                *  Eastern    District    of
Missouri.
                                        *
Fred King, Dr.; Anthony Gammon,         *
                                        *
            Appellees.                  *

_____

Submitted:  June 9, 1997
Filed:  December 11, 1997

_____

Before RICHARD S. ARNOLD, Chief Judge, HENLEY,[1] Senior Circuit Judge, and
      WOLLMAN, Circuit Judge.

_____

RICHARD S. ARNOLD, Chief Judge.

   Andrew Keeper, a Missouri inmate who had been incarcerated at the Moberly Correction Center (MCC), appeals from a judgment of the District Court[2] entered

_____

[1]Judge Henley died on October 18, 1997.  This opinion is consistent with his vote at the panel's conference following oral argument on June 9, 1997.

[2]The Honorable Jean C. Hamilton, Chief Judge, United States District Court for the Eastern District of Missouri.

upon

a jury verdict in favor of  Dr. Fred King, a former MCC physician, and Anthony Gammon, superintendent of MCC.  We affirm.

I.

On October 24, 1991, Keeper submitted a medical services request (MSR), complaining of headaches and blurred vision, but failed to appear for sick call.  On October 28 Keeper complained of dizziness, abdominal pain, and blurred  vision and was examined by a nurse, who diagnosed a likely muscle strain, prescribed Motrin, and told Keeper to return the next morning.  On October 29 Keeper was examined by  Dr. Hampton, who referred him to an ophthalmologist.  On November 11 Keeper submitted an MSR, complaining of blurred vision and right eye and head pain, but again failed to appear for sick call.  On November 18 Keeper, complaining of left-sided numbness, blurred vision, pain in the right eye, weakness, and an inability to stand at times, was again examined by Dr. Hampton, who prescribed Elavil for headaches and ordered a psychological examination, including testing.

On December 30 Keeper submitted two MSRs.  At 4:20 p.m. he complained of headaches and blurred vision.  A nurse examined and released him.  At 6:00 p.m. he noted that he had run out of Elavil and that his pain had returned.  He requested a complete physical "before something seriously does go wrong" and also submitted a letter detailing his complaints of headaches, blurred vision, and left-sided weakness and numbness.  Later that day, King reviewed Keeper's medical records and renewed his prescription for Elavil.  On January 1, 1992, Keeper

-3-

submitted another MSR, claiming his condition was worse and that he had had "mild strokes off and on."  On January 2 Keeper was brought to the medical unit on a stretcher, complaining of difficulty standing, dizziness, headaches, and numbness.  King examined him, but found "no medical problem" and ordered that Keeper complete psychological testing.  Although Keeper walked out of the unit on his own, he was brought back by a guard a few minutes later because he could not stand.  King did not reexamine Keeper. However,

Keeper was placed in administrative segregation for medical observation. As a routine matter, a nurse looked in on Keeper four times a day. He was also seen by a nurse on at least three other occasions, including January 17, when he was found lying on the floor unable to move. After returning to his regular cell on January 21, he was again found lying on the floor and was admitted to the infirmary for overnight observation. The next morning Keeper stated he was feeling fine and was discharged.

Keeper did not request or receive medical services again until Saturday, February 29, when he was brought to the medical unit after he was found sitting on a toilet unable to move or speak. A nurse called the MCC health care supervisor, Debra Williams, who was at home. Williams instructed the nurse to admit Keeper to the infirmary, check his vital and neurological signs every hour, and contact King. Although nurses tried to reach King by telephone several times on February 29, King, who did not carry a pager, was finally reached on March 1 at noon. King did not come to the infirmary, but instructed the staff to observe Keeper. At 3:00 p.m. that day Keeper was found lying on the floor wet with urine. His clothes were changed and his mattress was placed on the floor. He was found on the mattress wet with urine on Monday, March 2, at 1:30 a.m and 6:30 a.m. At 7:35 a.m. King came to the infirmary and examined Keeper. Although the doctor found "no apparent neurological defect" and gave a provisional diagnosis of conversion hysteria, King transferred Keeper to a hospital to rule out an obstruction in the brain. At the hospital a CAT scan revealed that Keeper had had a large stroke to the right side of the brain. An examining doctor noted that the

slow progression of the stroke was "a little unusual."

Keeper filed an action under 42 U.S.C. §1983 against King and Gammon, alleging that they had been deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment. At trial, Keeper, who was then forty-one years old, testified that he could no longer use his left arm or leg, had difficulty speaking and seeing, and that his condition had worsened since the stroke. In addition to introducing the medical records, Keeper also presented the testimony of Debra Williams and Dr. Peter Lewitt, a neurologist.

Williams testified that although King was the full-time physician and Hampton was the part-time physician on the medical unit staff, as health care supervisor she had the over-all responsibility for the medical unit, and, in the event of an emergency, could order an inmate's transfer to a hospital. Although Williams was not involved in the day-to-day treatment of patients, she stated she was familiar with Keeper's case. In November 1991 she had reviewed his records and discussed his condition with her staff after Gammon had informed her that Keeper's mother had contacted him regarding Keeper's condition. After her review, Williams reported to Gammon that Keeper was being monitored. She was also aware that Gammon had informed the unit that Keeper's mother had again inquired about his condition on December 29. According to Williams, by mid-January Keeper's symptoms had become consistent with transient ischemic attacks (TIA), which are brief neurological attacks that could be precursors to a stroke.

As to the events of February 29 to March 2, Williams testified that she was at home when she received a call from a nurse informing her that Keeper had been brought to the unit because he had difficulty moving his left leg and could not move his left arm.  Williams returned to work on March 2 and examined Keeper.  Williams testified that she was ''shocked" that King had found "no apparent neurological defect" during his examination, because her examination revealed that Keeper had facial drooping, halting and slurred speech, and a limp left arm.

On cross-examination, Williams admitted that on February 29 she had instructed her staff to call her at home if they could not reach King or if Keeper's condition had changed, but that no one called her.  Williams also stated that she was aware that a list of physicians who were on call was posted on a bulletin board in the medical unit, but admitted that she had never called a doctor on the list and did not know how the list was to be used.

Dr. Lewitt, who practices and teaches neurology in Michigan, testified by video-taped deposition.  He stated that risk factors for a stroke were high blood pressure and an abnormal heart rhythm and that symptoms of a stroke included numbness, but generally not a headache.  Based on his review of  Keeper's medical records, Dr. Lewitt believed that as of December 30, 1991, Keeper presented a medical emergency, and that a brain scan would have been appropriate.  The doctor stated that on February 29 Keeper had a stroke, and King's order to observe was an inappropriate response.  Lewitt believed that Keeper's stroke had progressed slowly, and that had it been diagnosed and treated earlier there was a possibility that

some of the effects of the stroke could have been prevented. In sum, the doctor believed that there was "a major neglect of a treatable neurological condition."

Gammon testified that as superintendent of MCC he was responsible for the over-all operation of the MCC, but that he had no medical training or expertise. Gammon stated that although he knew Keeper's name, he was not personally familiar with him and had never received a grievance or letter concerning Keeper's care. Gammon stated that when he or his office had received telephone inquiries from Keeper's mother, the inquiries were referred to Williams because she was responsible for the operation of the infirmary.

King, who at the time of trial was employed by the Iowa Department of Corrections, testified that it was a nurse's responsibility to refer a patient to a physician, and in an emergency, if a nurse could not reach a doctor, the nurse or the health care supervisor could order a transfer of the inmate to a hospital. King admitted he did not carry a pager, but explained that, although he volunteered to see patients on nights and weekends, he was not on call twenty-four hours a day, seven days a week. Instead, he stated five to six physicians were on call. King believed that he had treated Keeper's symptoms appropriately and explained that he had ordered psychological testing because some of Keeper's symptoms could have been caused by a conversion hysteria,

a process whereby a person converts a mental problem into an actual physical problem, or by malingering, whereby a person "fakes" symptoms. According to King, malingering was a common problem in prison. King stated that he reported that Keeper had "no apparent neurological defect" on March 2 because physical examination revealed "no evidence of pathological neurological signs," such as a positive Babinski response, deep tendon reflex, or ankle clonus.

King also presented the testimony of Dr. Michael Hatlelid, a neurologist in private practice in St. Louis, Missouri, and on the faculty of a local medical school. The doctor, who in the year before trial had treated three hundred stroke patients and three to four hundred headache patients, testified about the differences in symptoms between a TIA and a migraine headache. According to the doctor, symptoms of a TIA were numbness on one side of the body, double vision, blindness, and vertigo, but not as a general rule dizziness and blurred vision. Symptoms of a migraine headache were throbbing head pain, nausea, blurred vision, and numbness. Dr. Hatlelid also noted that, other than cigarette smoking, Keeper did not present the major risk factors for stroke, such as high blood pressure, blood clotting problems, heart disease, or diabetes.

Although Dr. Hatlelid believed that before February 29 Keeper's symptoms had been consistent with migraine headaches, nonetheless the doctor testified that around mid-January he would have ordered an ultrasound examination to determine whether there was an abnormality in the carotid artery in Keeper's neck. If the ultrasound showed a significant abnormality, the doctor would have

performed an angiogram of the artery to determine whether there was a surgically correctable condition.  However, Dr. Hatlelid stated that had an ultrasound been performed in January, it would have been normal, since a March 3 ultrasound examination was essentially normal, showing only "minimal atherosclerotic disease of the carotid artery with a 0-19 percent diameter reduction of the internal artery."  The doctor also noted that additional testing at the hospital failed to reveal the cause of the stroke.  Thus, according to the doctor, "the fact additional workup was not done in January 1992 ha[d] no practical significance."

Based on his review of the medical records, Dr. Hatlelid expressed the opinion that Keeper did not have a series of strokes, but had one single catastrophic stroke on February 29, which was caused by a dissection, or a tear, of the carotid artery.  The doctor explained that irreversible damage occurs when the artery tears "like that, quickly," and it "wouldn't have mattered if [Keeper] had been transported . . . in seconds to any hospital."

The jury returned verdicts in favor of King and Gammon.  Keeper filed a motion for a judgment as a matter of law, or, in the alternative, for a new trial, which the district court denied.

## II.

On appeal Keeper argues that the District Court erred in denying his motion for judgment as a matter of law or for a new trial. "We review de novo the District Court's denial of [Keeper's] motion for judgment as a matter of law, applying the same standards as the District Court." Nicks v. Missouri, 67 F.3d 699, 704 (8th Cir. 1995). "Judgment as a matter of law is appropriate when the nonmoving party has not offered sufficient evidence 'to support a jury verdict in his or her favor.' " Id. (quoting Abbott v. City of Crocker, 30 F.3d 994, 997 (8th Cir. 1994)).  " 'Our task in reviewing a judgment entered on a jury verdict is simply to inquire whether, viewed in the light most favorable to [the nonmoving party], the evidence at trial supports the verdict.' " Id. (quoting Rademaker v. Nebraska, 906 F.2d 1309, 1313 (8th Cir. 1990)).  In so doing, we give the nonmoving party " 'the benefit of all reasonable inferences from the evidence,'

and [we] may not reassess the jury's credibility decisions."  Id.  (quoting Abbott, 30 F.3d at 997).

We review the district court's denial of Keeper's motion for a new trial for an abuse of discretion.  Keenan v. Computer Assoc. Int'l, Inc., 13 F.3d 1266, 1269 (8th Cir. 1994).  Where, as here, "the basis of the motion for a new trial is that the jury's

verdict is against the weight of the evidence, the district court's denial of the motion 'is virtually unassailable on appeal.' " Id. (quoting Peterson v. General Motors Corp.,904 F.2d 436, 439-40 (8th Cir. 1990)). "The key question is whether a new trial should have been granted to avoid a miscarriage of justice.'' Id.

We now turn to Keeper's section 1983 claim. In this deprivation-of-medical-care case, Keeper had to "show that the prison official[s] w[ere] deliberately indifferent to [his] serious medical needs." Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997). To prove deliberate indifference, Keeper had to show that King and Gammon "knew of, yet disregarded, an excessive risk to his health." Logan v. Clarke, 119 F.3d 647, 649 (8th Cir.1997) (citing Farmer v. Brennan, 511 U.S. 825, 837 (1994)). In Farmer, the Supreme Court made clear that an official had to have actual knowledge of a serious risk. The Court stated that "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned" under the Eighth Amendment. 511 U.S. at 838.

As to Gammon, the district court did not err in denying Keeper's motion for judgment or for a new trial. It is well settled that " '[r]espondeat superior is not a basis for liability under 42 U.S.C. § 1983.' " Kulow v. Nix, 28 F.3d 855, 858 (8th Cir. 1994) (quoting Smith v. Marcantonio, 910 F.2d 500, 502 (8th Cir. 1990)). In particular, this Court has noted that "a general responsibility for supervising the operations of a prison

is insufficient to establish the personal involvement required to support liability." Camberos v. Branstad, 73 F.3d 174, 176 (8th Cir. 1995). Because Gammon was not involved in treatment decisions made by the medical unit's staff  and "lacked medical expertise, [he] cannot be liable for the medical staff's diagnostic decision[s]." Id. Moreover, Gammon  never received a complaint or grievance from Keeper, and when his mother inquired about Keeper Gammon referred inquiries to Williams, who assured Gammon that Keeper's condition was being monitored.  "In these circumstances,  'if any claim of medical indifference . . . is to succeed, it must be brought against the individual[s] directly responsible for [Keeper's] medical care.' "  Kulow, 28 F.3d at 859

(quoting Brown v. Wallace, 957 F.2d 564, 566 (8th Cir. 1992)).

The district court also did not err in denying Keeper's motion for judgment as to King. Keeper is correct that "[t]he factual determination that a prison official had the requisite knowledge of a substantial risk may be inferred from . . . the very fact that the risk was obvious." Coleman, 114 F.3d at 786. However, Dr. Hatlelid's testimony was that the risk of stroke from Keeper's symptoms before February 29 was not obvious. Even Dr. Lewitt's testimony shows only a disagreement as to diagnosis, which is not actionable under the Eighth Amendment. See Vaughan v. Lacey, 49 F.3d 1344, 1346 (8th Cir. 1995). Keeper also relies on Dr. Hatlelid's testimony that he would have ordered an ultrasound examination in mid-January. Keeper's reliance is misplaced. " '[W]hen [an] inmate alleges that the delay in treatment is the constitutional deprivation, the objective seriousness of the deprivation should also be measured by reference to the effect of delay in treatment.' " Crowley v. Hedgepeth, 109 F.3d 500, 502 (8th Cir. 1997) (quoting Beyerbach v. Sears, 49 F.3d 1324, 1326 (8th Cir. 1995)). In this case, Dr. Hatlelid testified that although an ultrasound examination would have been appropriate, the fact that it was not ordered had "no practical significance." Thus, the doctor's testimony does not help Keeper's case.

It is undisputed that Keeper had a stroke on February 29, and it is indeed regrettable that he was not transferred to the hospital immediately, but instead was allowed to lie on a mattress on the floor, repeatedly

voiding on himself. However, King cannot be held liable for the nursing staff's failure to order an immediate transfer, to contact another doctor, or to inform him fully of Keeper's condition. See Smith, 910 F.2d at 502 (prison doctor could not be held liable for "claims of inadequate treatment by other medical personnel"). As King points out, even Williams testified that although she had instructed her staff to call her if they could not get in touch with King or if Keeper's condition had changed, no one called her. In any event, even if King had had actual knowledge of Keeper's condition on February 29, Dr. Hatlelid's testimony that the delay in getting Keeper to the hospital had no detrimental effect would support the

verdict.  See Coleman, 114 F.3d at 784; Crowley, 109 F.3d at 502.

Nor did the district court abuse its discretion in denying Keeper's motion for a new trial as to King. "[W]here reasonable [persons] can differ in evaluating credible evidence, a new trial on the ground of weight of the evidence should not be granted." White v. Pence, 961 F.2d 776, 781 (8th Cir. 1992).  In addition, a motion should not be granted merely " 'because judges feel that other results are more reasonable.' " Id. at 780 (quoting Fireman's Fund Ins. Co. v. Aalco Wrecking Co., 466 F.2d 179, 186 (8th Cir. 1972), cert. denied, 410 U.S. 930 (1973)).  Although the jury could have chosen to believe Williams's or Dr. Lewitt's testimony, it chose to believe Dr. Hatlelid's testimony.  Thus, the District Court did not err in denying Keeper's motion for a new trial.

On appeal Keeper also raises evidentiary and instructional issues.  He argues that the District Court erred in sustaining King's motion in limine to exclude evidence relating to King's alleged mistreatment of other inmates and of King's alleged intoxication on two occasions in 1990 and 1991.  However, as King points out, because Keeper failed to make offers of proof he has failed to preserve the issues for review.  Keeper suggests that an offer of proof was unnecessary since the District Court granted the motion in limine.  We disagree. This Court has indicated that, as a general rule, in order to preserve an evidentiary issue for appeal an offer of proof is necessary, even if the district court grants a motion in limine.  Dupre v. Fru-Con Eng'g Inc., 112 F.3d 329, 336 (8th Cir. 1997).  In this case, there is no reason to depart from that rule.  In particular, we note that in its

-17-

pretrial ruling the Court indicated that it would exclude evidence of King's alleged mistreatment of other inmates as to King, but might allow such evidence if relevant to establish Gammon's knowledge. When Keeper's counsel attempted to question Gammon about one of the incidents, the District Court found the incident was not relevant, but told Keeper's counsel "[t]hat may well be something you want to get in if Dr. King takes the stand." Despite this invitation, counsel made no effort to question King concerning the incident. In any event, had Keeper preserved the issues for review we would find no abuse of discretion in excluding evidence

relating to King's alleged mistreatment of other inmates or King's alleged intoxication on other occasions.

Keeper also argues that the verdict director instructions were incorrect statements of the law. However, he did not raise his objections in the District Court. "Our law on this subject is crystal clear: to preserve an argument concerning a jury instruction for appellate review, a party must state distinctly the matter objected to and the grounds of the objection on the record." Id. at 334. Thus, we have reviewed for plain error only, and find none.

Accordingly, we affirm the judgment.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.