# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

———————————

No. 97-2135

———————————

Mary K. Howard,     *
    *
    Plaintiff - Appellee,     *
    *
    v.     *     Appeal from the United States
    *     District Court for the
Burns Bros., Inc., an Oregon     *     District of Nebraska.
Corporation, doing business as Mrs. B's     *
and Burns Brothers Truck Stop,     *
    *
    Defendant - Appellant.     *

———————————

Submitted:  December 12, 1997
Filed:  July 14, 1998

———————————

Before MURPHY, JOHN R. GIBSON, and MAGILL, Circuit Judges.

———————————

JOHN R. GIBSON, Circuit Judge.

      Burns Brothers, Inc. appeals from the district court's entry of judgment against it after a jury verdict in favor of Mary Howard on her Title VII claims. Howard sued Burns Brothers for hostile environment sexual harassment and constructive discharge she allegedly suffered when she worked as assistant manager at a Burns Brothers truck stop in Overton, Nebraska. The jury returned a verdict for Howard of $25,000 actual and $75,000 punitive damages on the constructive discharge claim, and $1,000 actual and $2,000 punitive damages on the hostile environment claim. The district court

denied Burns Brothers' motions for new trial, remittitur, and judgment as a matter of law on liability and on damages. Burns Brothers contends on appeal that the district court erred in denying its motions and in instructing the jury. We affirm on the hostile environment actual and punitive damages claims, and we reverse the denial of the motion for judgment as a matter of law as to the constructive discharge claim.

The facts stated in Burns Brothers' and Howard's briefs, respectively, are so different that they seem to describe entirely different trials and different chains of occurrences. Similarly, the testimony about the events at the truck stop varies wildly according to whether the plaintiff's or defendant's witnesses are testifying. We, of course, do not resolve these discordant accounts, but instead must view all the facts in the light most favorable to the party that prevailed before the jury, giving that party the benefit of all reasonable inferences that can be drawn from the evidence, see Tidwell v. Meyer's Bakeries, Inc., 93 F.3d 490, 494 (8th Cir. 1996), and resolving all credibility questions in that party's favor.

In July 1990 Mary Howard started working as a cashier at the Burns Brothers truck stop, which consisted of a restaurant and a fuel station. John Wood was the general manager of the whole operation, and his wife, Stephanie Wood, was the restaurant manager. After about a year and a half, Howard was promoted to assistant manager of the fuel station. Burns Brothers had posted at the truck stop a corporate policy prohibiting sexual harassment. The notice included the phone number of a contact person at the corporate headquarters in Portland, Oregon, for complaints that were not handled satisfactorily at the local level.

Howard's sexual harassment complaints stem from the conduct of Keith Daake, a co-employee. She testified that from the time she started working at Burns Brothers, Daake was "always saying sexual innuendos." She testified that Daake once told her she had nice legs and that he was "going to get [her]." She said that she reported this

comment to John Wood, who said, "That's just Keith," and did nothing more.[1]  Howard said that Daake would often brush against her intentionally while the two of them were working in the narrow area behind the fuel counter.  Once Daake brushed Howard's buttocks, and she kicked him.  Howard and the assistant manager for the restaurant, Pat Kiger, complained to John Wood several times about Daake brushing against them.

Howard also testified that Daake said and did inappropriate things to other female employees.  We have considered harassment of employees other than the plaintiff to be relevant to show pervasiveness of the hostile environment.  See Hall v. Gus Const. Co., 842 F.2d 1010, 1015 (8th Cir. 1988).  Cathy Piska complained to Mary Howard and to John Wood that  Daake would "touch [her] butt or put his arm around [her]" or "talk nasty."  Linda Wolf complained to Howard that Daake was making sexual innuendos.  Howard reported this complaint to John Wood.  Additionally, Howard said that Burns Brothers' regional manager, Jack Fairfield, saw Daake "[rub] up next to" Wolf.  Howard said Fairfield commented to her, "[T]hat's not very good . . .  John needs to do something about that."

In addition to the incidents recited above, there was also evidence of two jokes Daake told in which the punch line involved lewd gestures, in one instance, touching a woman's breast, and in the other, thrusting his hips into a woman from behind.  The women who testified about the jokes said that one or both of the Woods were present for the jokes.

---

[1]Burns Brothers protests that these incidents concern a time outside the 300-day window of 42 U.S.C. § 2000e-5(e)(1)(1994).  In hostile environment cases, harassing acts committed outside the 300-day period are nevertheless relevant as background in assessing the sexual content of acts that occurred during the relevant time period or in the case of a continuing violation.  Kimzey v. Wal-Mart Stores, Inc., 107 F.3d 568, 572-73 (8th Cir. 1997).

Howard also cites testimony of Pat Kiger and Barb Martin about Daake's conduct toward Barb Martin, a cook at the restaurant. The two witnesses said that Daake had called Martin a "fucking bitch" and had written a note on his meal order, "Don't kill it," apparently meaning not to burn his meal. Kiger reported Daake's behavior to the Woods. John Wood testified that he reprimanded Daake about the incidents.

On Sunday, January 9, 1994, a young waitress, Cameo Svavari, complained to Howard and Kiger about Daake's conduct. Howard and Kiger asked her to write up a list of what Daake had said and done. Svavari jotted down a list of seven examples of suggestive things Daake had said or done. The Woods were off-duty at the time, so Howard and Kiger drove over to their house to deliver the list. They told John Wood that "if something wasn't -- wasn't done about this that we were going to go to Portland [Burns Brothers' corporate headquarters], we were going to go higher, that this was ridiculous." John Wood told Kiger and Howard to go back to the truck stop and get out the corporate policy on sexual harassment and that he would come down to the truck stop. About an hour later, Wood came to the truck stop, called Daake into the office, and gave him a "final warning." The warning was reduced to writing and signed by Wood and Daake. The document cited Daake for "Making unwanted sexual remarks to other company members. Also being too familiar and touching female company members." It said that the next disciplinary action against Daake would be "up to and including suspension and/or discharge."

Howard testified that John Wood's treatment of her changed from that day on. After the Svavari complaint, "John [Wood] wouldn't talk to me. If I-- he had me or wanted me to do something, he'd write it down on a piece of paper." She testified that she got "dirty looks" from the people on the day shift, including John and Stephanie Wood. Howard said John Wood:

wouldn't talk to me, wouldn't even give me the time of day. He would say nothing. He'd walk the other way so as to not walk by me. If he did have to walk by me, he'd look me up and down like I was a nothing and a nobody. Him and Stevie [Stephanie Wood] and Keith and Susie [Daake's wife] would sit in a booth after they got off their shift right beside the fuel desk and laugh like you knew they were laughing about you. . . .

She said that she received poor treatment from "anybody basically that worked on the day shift." Several witnesses corroborated Howard's testimony that John Wood was cool toward her. One witness said that after the Svavari complaint "things seemed tense" and "[i]t just didn't seem like John had any respect for Mary's position." Pat Kiger said that after the complaint John Wood treated Howard "very, very, very cold, very badly," and that he left her "rude, nasty note[s] . . . such things as do this and do that." Another witness said that she observed that John Wood wouldn't speak to Howard.

Howard and her husband testified that Howard was upset by John Wood's treatment of her, and that she frequently cried about her working conditions.

After John Wood gave Daake his "final warning," Howard testified that she had no further trouble with Daake touching her. She agreed that "Daake pretty much stayed away from [her] . . . after that." There was, however, a verbal exchange that took place after the warning that Howard considered further sexual harassment.

The incident occurred in the midst of a struggle over the truck stop's thermostat setting. Howard wanted the thermostat turned up high because she was cold in the office, where she worked. Other employees complained that the thermostat was set too high and they had adjusted the setting. Howard testified that she put a lock on the thermostat to keep other employees from lowering the setting, and she told the other

employees to "leave the heat alone." She said Keith Daake replied, "[Y]ou don't need heat, I can warm you up."[2]

Howard never complained about Daake to Burns Brothers' corporate office, though she was aware of Burns Brothers' anti-harassment policy.

Howard turned in her resignation at Burns Brothers on February 8, 1994. Her last day on the job was February 15, and she started a new job the next day.

Howard sued Burns Brothers under Title VII, for maintaining a sexually hostile environment, 42 U.S.C. § 2000e-2(a) (1994), and for constructively discharging her in retaliation for her role in the Cameo Svavari complaint. 42 U.S.C. § 2000e-3 (1994). The jury found for Howard. On the constructive discharge claim, the jury awarded Howard $4,400 in economic damages, $25,000 in compensatory damages, and $75,000 in punitive damages. The jury awarded Howard $1,000 compensatory and $2,000 punitive damages on the sexually hostile work environment claim.

Burns Brothers moved for judgment as a matter of law, new trial, and reduction or elimination of compensatory and punitive damages. The district court denied Burns Brothers' motions.

**I.**

Burns Brothers contends that the district court erred in denying it judgment as a matter of law. We review de novo the district court's denial of judgment as a matter of law, examining whether there is sufficient evidence to support the jury's verdict. Tidwell, 93 F.3d at 494. We view the evidence in the light most favorable to the jury's

---

[2]Howard's diary also states that on January 23, 1994, Daake called Pat Kiger a "bitch" during a dispute about the coffee maker.

verdict, giving the party who prevailed before the jury the benefit of all reasonable inferences. Id. Judgment as a matter of law is appropriate only when there is a complete absence of probative facts supporting the jury's verdict, so that no reasonable juror could have found for the nonmoving party. Hathaway v. Runyon, 132 F.3d 1214, 1220 (8th Cir. 1997).

## II.

To prove that she was subjected to a hostile work environment in violation of Title VII, Howard had to show that:

> (1) she belongs to a protected group; (2) she was subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) [Burns Brothers] knew or should have known of the harassment and failed to take proper remedial action.

Kopp v. Samaritan Health Sys., Inc., 13 F.3d 264, 269 (8th Cir. 1993). Harassment affects a term, condition, or privilege of employment if it is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quoting Meritor Sav. Bank v. Vinson, 477 U.S. 57, 67 (1986)). The conduct must be sufficient to create a hostile environment, both as it would be viewed objectively by a reasonable person and as it was actually viewed subjectively by the victim. Harris, 510 U.S. at 21-22. Relevant factors for determining whether conduct rises to the level of abusiveness include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 23.

Burns Brothers contends that there was a failure of proof on two elements of the hostile environment claim: first, that the evidence does not show that Howard was subjected to conditions amounting to an abusive working environment, and second, that Burns Brothers took prompt remedial action when notified of the Cameo Svavari complaint.

We are convinced that there is evidence of offensive conduct in this case. Two aggravating factors are present, unwanted physical contact when Daake allegedly brushed against Howard behind the fuel desk, and frequency of the conduct, since Howard testified that Daake's sexual innuendos were chronic. There was also evidence that the conduct was upsetting to Howard; she testified that she thought Daake was "a sick man" and that she complained about his "ridiculous" conduct.

Once there is evidence of improper conduct and subjective offense, the determination of whether the conduct rose to the level of abuse is largely in the hands of the jury. See Hathaway, 132 F.3d at 1221.

> Justice Scalia pointed out in his concurring opinion [in Harris] that since Congress set no clear standard defining a hostile environment, it must be left to "virtually unguided juries" to decide whether particular conduct is "egregious enough" to merit an award of damages. There is no bright line between sexual harassment and merely unpleasant conduct so a jury's decision must generally stand unless there is trial error.

Id. (internal citations omitted). We therefore conclude that Howard made a sufficient showing of abusive conduct to support the jury's verdict in her favor.

As for remediation, Burns Brothers relies on the evidence in the light most favorable to it, that John Wood gave Daake a serious warning when he first became aware of improper conduct--at the time of the Svavari complaint. After that time,

Howard admitted Daake did not brush against her anymore, although she testified that he said he could "warm her up" in connection with the thermostat dispute. But Howard testified that she had complained to John Wood about Daake long before the Svavari complaint, and that Wood did nothing. Howard therefore made a submissible case that Burns Brothers management knew of Daake's conduct, but failed to put a stop to it promptly. Once the plaintiff makes a submissible case, the promptness and adequacy of the employer's response to a complaint of harassment are fact questions for the jury to resolve. See Smith v. St. Louis Univ., 109 F.3d 1261, 1265 (8th Cir. 1997). On this record we may not disturb the jury's verdict.

## III.

Howard alleged that she was constructively discharged in retaliation for helping Cameo Svavari file a written complaint about Keith Daake's conduct. Specifically, Howard contends that John Wood and the day shift employees "would not speak to her following the Cameo Svavari complaint," and that Howard's "authority [was] undermined by John Wood, [so that] Howard could not effectively do her job, and quit." Burns Brothers argues that Howard failed to show she was constructively discharged or that Wood's treatment of Howard was retaliation for the Svavari complaint. Burns Brothers contends that Howard's poor relationship with Wood and the other employees stemmed from Howard's improper conduct, such as stealing papers out of Wood's briefcase and publicly cursing another employee over the thermostat setting.

To establish a case of Title VII retaliation, Howard had to show: (1) that she engaged in a protected activity; (2) that she suffered an adverse employment action; and (3) that adverse action occurred because of her protected activity. Coffman v. Tracker Marine, L.P., 141 F.3d 1241, 1245 (8th Cir. 1998); Cross v. Cleaver, 1998 WL 164414, No. 97-3441, slip op. at 22-23 (8th Cir. April 10, 1998).

Howard's theory of the adverse employment action was that she was constructively discharged by Wood's conduct towards her after the Svavari complaint. She contends that Wood was cold to her and would not talk to her, and that it "was impossible for Howard to have done her job without the backing of her general manager, John Wood." She testified that after the Svavari complaint, rather than speak to her, Wood left her notes about what needed to be done.

Burns Brothers contends that Howard did not prove facts sufficient to permit a jury to find she was constructively discharged.

> To constitute a constructive discharge, the employer must deliberately create intolerable working conditions with the intention of forcing the employee to quit and the employee must quit. The plaintiff can satisfy the intent requirement by demonstrating that he quit as a reasonably foreseeable consequence of the employer's discriminatory actions.
>
> A constructive discharge arises only when a reasonable person would find the conditions of employment intolerable.

Tidwell, 93 F.3d at 494 (citations omitted).

Our recent cases have struggled with the question of what type of conditions are "intolerable" for constructive discharge purposes. "A plaintiff must show more than just a Title VII violation by her employer in order to prove that she has been constructively discharged." Coffman, 141 F.3d at 1247 (citing Tidwell, 93 F.3d at 495). In Tidwell, an employee who worked in an environment that was "tinged with discriminatory acts" was nevertheless not constructively discharged, because the acts were not so severe that a reasonable person would have found them intolerable. Id. at 497. Similarly, in Hanenburg v. Principal Mutual Life Insurance Co., 118 F.3d 570 (8th Cir. 1997), we affirmed summary judgment for the employer in a disparate

treatment case, holding that the employee did not make a prima facie case of constructive discharge, though she produced evidence that "her supervisors scrutinized her behavior in the workplace more closely than it [sic] did other employees." Id. at 575. We stated that this discriminatory conduct could not, as a matter of law, suffice to establish constructive discharge: "While all this no doubt made work less enjoyable for Hanenburg and might have induced stress for her, there is simply not enough evidence to support a finding that her supervisors' conduct created the compulsion to quit that is necessary for a constructive discharge." Id. at 575.

In recent cases in which we have affirmed constructive discharge verdicts, we have emphasized the employee's lack of recourse within the employer's organization. We upheld a constructive discharge verdict in Delph v. Dr. Pepper Bottling Co., 130 F.3d 349, 356-57 (8th Cir. 1997), based on a hostile environment. We held that the hostile environment was bad enough to constitute constructive discharge, because the harassment--racial slurs--came from the plaintiff's supervisor and the offending language was not only used in the plaintiff's presence, but was directed at him. Id. at 356. In Kimzey v. Wal-Mart Stores, Inc., 107 F.3d 568, 574 (8th Cir. 1997), we emphasized management's indifference to the employee's complaints of hostile environment in affirming the plaintiff's verdict on constructive discharge: "If an employee quits because she reasonably believes there is no chance for fair treatment, there has been a constructive discharge." Id. at 574. In contrast, we reversed the constructive discharge judgment in Coffman, in part because the employee had an avenue of redress within the company and failed to use it. 141 F.3d at 1247-48. Accord Knowles v. Citicorp Mortgage, Inc., 1998 WL 191163, No. 97-3302, slip op. at 8 (8th Cir. April 23, 1998) (affirming summary judgment for employer on constructive discharge claim because employee did not pursue internal grievance procedure). Cf. Faragher v. Boca Raton, No. 97-282, 1998 WL 336322 at *19 (U.S. June 26, 1998) (recognizing affirmative defense to supervisor harassment; employer must show that it had sufficient anti-harassment policy and that plaintiff unreasonably

failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise).

In this case, the alleged retaliatory conduct came from Howard's supervisor, a factor which pointed to constructive discharge in <u>Delph</u>. On the other hand, Burns Brothers had posted a corporate policy against sexual harassment at the Overton truck stop. The policy included a phone number of a contact person at the corporate headquarters in Portland, Oregon, for any complaints that were not resolved satisfactorily at the local level. Howard was clearly aware of this policy since she and Pat Kiger threatened John Wood that they would take the Svavari complaint to Portland if he did not act on it. Despite this knowledge, Howard failed to pursue the remedy Burns Brothers provided. "If an employee quits without giving her employer a reasonable chance to work out a problem, then she has not been constructively discharged." <u>Coffman</u>, slip op. at 10. We conclude that Howard did not prove facts sufficient as a matter of law to constitute constructive discharge.

We therefore hold that considering the evidence in the light most favorable to Howard, and giving her the benefit of all reasonable inferences, Howard failed to prove that she was constructively discharged. Since constructive discharge was her theory of the "adverse employment action," she has failed to prove an essential element of her retaliation claim. It is therefore not necessary for us to consider whether she proved that the reason for the "adverse employment action" was retaliation for her role in the Svavari complaint, or whether, as Burns Brothers contends, there were other reasons for her poor relationships with co-workers.

## IV.

Burns Brothers argues that there was insufficient evidence to support the jury's award of compensatory and punitive damages.

## A.

The jury awarded compensatory damages of $1,000 on the hostile environment claim and $25,000, plus lost wages and benefits of $4,400, on the constructive discharge claim. Since we reverse on the constructive discharge claim, we need only consider the $1,000 award on the hostile environment claim.

Under the Civil Rights Act of 1991, victims of intentional discrimination prohibited by Title VII may recover compensatory damages for "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." 42 U.S.C. § 1981a (b)(3); Landgraf v. USI Film Prods., 511 U.S. 244, 253 (1994). Howard and her husband both testified that she suffered mental anguish as a result of her experiences at Burns Brothers.

Burns Brothers argues that Howard did not present "competent" evidence of emotional injury. Howard and her husband's testimony were competent evidence on the subject of her emotional distress. See Kim v. Nash Finch Co., 123 F.3d 1046, 1065 (8th Cir. 1997).

Burns Brothers also argues that the award was excessive. The evidence was sufficient to support the $1,000 award for maintaining a hostile environment.

## B.

The jury awarded Howard punitive damages of $2,000 on the hostile environment claim and $75,000 on the constructive discharge claim. Again, because of our disposition of the constructive discharge claim, we need consider only the $2,000 award on the hostile environment claim. A Title VII plaintiff may recover punitive damages under 42 U.S.C. § 1981a (b)(1) if he demonstrates that the defendant engaged in discriminatory practices "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." Section 1981a requires a showing of more than intentional discrimination to support an award of punitive damages. Browning v. President Riverboat Casino-Missouri, Inc., 139 F.3d 631, 637 (8th Cir. 1998). Even a finding of retaliation does not necessarily justify an award of punitive damages. See Karcher v. Emerson Elec. Co., 94 F.3d 502, 509 (8th Cir. 1996), cert. denied, 117 S. Ct. 1692 (1997). See also Varner v. National Super Markets, Inc., 94 F.3d 1209, 1214 (8th Cir. 1996) (insufficient case for punitive damages where seventeen-year-old girl twice sexually assaulted by co-worker; second assault occurred after complaint to management, which took no action), cert. denied, 117 S. Ct. 467 (1997).

In this case, Daake's inappropriate conduct continued over years, with frequent and regular notice to John Wood. Howard testified that Daake's pattern of sexual innuendo and intentional touching was chronic and began as soon as she started working at Burns Brothers in 1990. She said that when she complained to John Wood, he said, "That's just Keith." Howard said she complained to Wood about the touching "several times" from November 1991 until February 1994.

Howard and Pat Kiger also complained to John Wood over the years about Daake's harassment of other employees, such as Linda Wolf and Cameo Svavari. Cathy Piska also testified that she complained directly to John Wood. Pat Kiger said she

-14-

mentioned the Daake harassment problem at almost every manager's meeting, which occurred monthly.

Additionally, one or both of the Woods were present for each of the two lewd jokes that involved Daake touching a female employee's breast or buttocks.

Howard also testified that the regional manager, Jack Fairfield, was present and observed Daake harassing Linda Wolf. Fairfield said, "[T]hat's not very good . . . John needs to do something about that." Fairfield, Kiger and Howard "[t]alked at great length" about the Daake problem.

Management's practice of turning a blind eye to repeated complaints of misconduct was sufficient to demonstrate "reckless indifference" in Kimzey, 107 F.3d at 576. Here, Burns Brothers' manager ignored frequent complaints over at least two to three years, as well as lewd jokes involving offensive touching in his presence. This evidence was sufficient to support submission of punitive damages to the jury under the federal "reckless indifference" standard, as well as to support the $2,000 amount awarded.

## V.

Burns Brothers argues that the district court erred in denying its motion for a new trial on the ground that the verdict was against the weight of the evidence. The district court's denial of such a motion is "virtually unassailable on appeal," Keeper v. King, 130 F.3d 1309, 1314 (8th Cir. 1997) (quotation omitted).[3] The movant must

---

[3]In Green v. American Airlines, Inc., 804 F.2d 453, 455-56 (8th Cir. 1986), we discussed the unresolved constitutional question of whether an appellate court can order a new trial on the ground that the verdict is against the weight of the evidence. Because Burns Brothers made no showing of miscarriage of justice, we need not reach the

-15-

show that a new trial was necessary to avoid a miscarriage of justice. Id. Burns Brothers has made no such showing.

Burns Brothers also contends that the district court erred in submitting an instruction that the jury could consider evidence outside the relevant time period in evaluating the events that occurred during the relevant time. Burns Brothers also contends the court erred in denying its request for another instruction. We detect no abuse of discretion in the district court's instruction rulings. See Karcher, 94 F.3d at 510 (instruction rulings reviewed for abuse of discretion); Kimzey, 107 F.3d at 572-73 (evidence of harassment outside relevant period admissible in evaluating actions within relevant period).

. . .

We therefore affirm the judgment in favor of Howard on her hostile environment claim and the award of compensatory and punitive damages on that claim. We reverse the judgment on the constructive discharge claim.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

------

constitutional question here.