United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**

_____

No. 96-3909

_____

| | | |
|---|---|---|
| Tommy E. Delph, | * | |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | Appeals from the United States |
| | * | District Court for the |
| Dr. Pepper Bottling Co. of Paragould, | * | Eastern District of Missouri. |
| Inc., also known as Dr. Pepper-7Up | * | |
| Bottling Company, | * | |
| | * | |
| Appellant. | * | |

_____

No. 97-1160

_____

| | |
|---|---|
| Tommy E. Delph, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Dr. Pepper Bottling Co. of Paragould, | * |
| Inc., A corporation, doing business as | * |
| Dr. Pepper-7Up Bottling Company, | * |
| | * |
| Appellant. | * |

_____

Submitted: September 11, 1997
Filed: December 5, 1997
_____

Before BOWMAN, Circuit Judge, HENLEY,[1] Senior Circuit Judge, and MORRIS
   SHEPPARD ARNOLD, Circuit Judge.
_____

BOWMAN, Circuit Judge.


   Dr. Pepper Bottling Company of Paragould (Arkansas), Inc., appeals from the
judgment of the District Court rendered after a bench trial holding the company liable
for maintaining a racially hostile work environment that resulted in the constructive
discharge of Tommy Delph. The court awarded Delph $24,800 in back pay; $150,000
in compensatory damages; and $50,000 in punitive damages. Dr. Pepper separately
appeals the award to Delph of attorney fees in the amount of $88,800. We have
consolidated the two cases and now affirm, except insofar as we reduce the amount of
the compensatory damages award.


                                     I.


   We first recount the facts of the case, taking the evidence presented at the two-
day trial in the light most favorable to the judgment. See Tidwell v. Meyer's Bakeries,
Inc., 93 F.3d 490, 494 (8th Cir. 1996). Delph, a black man, went to work for Dr.
Pepper's Poplar Bluff, Missouri, facility on May 4, 1990. He was hired as a part-time

_____

[1]Judge Henley died on October 18, 1997. This opinion is not inconsistent with
his vote at the panel's conference following oral argument of the case on September 11,
1997.

truck loader by Tom Orosz, branch sales manager, who was responsible for running the Poplar Bluff operation. Within two months, Delph was made the merchandiser at the Wal-Mart store, one of the branch's largest accounts. Soon after that he was promoted to a position as route salesman, a full-time position that involved visiting customers on a fixed route (including the Wal-Mart store), selling soft drinks, delivering the product to the stores, and stocking the shelves. He was also expected to call on potential new customers. Effective June 15, 1992, Delph terminated his employment with Dr. Pepper.

Delph was the only black person working at the Poplar Bluff facility during his tenure with Dr. Pepper. He presented testimony at trial of several incidents that had serious racial overtones. He testified that Orosz and Terry Anspach, Delph's route supervisor for a time, had told Delph on two or three occasions that he should not be found in Fisk, Missouri, after dark because no blacks worked there. The implication was that Delph should be frightened to find himself in such a situation. In keeping with that theme, Orosz also spoke with Delph about taking him deer hunting in Hardy, Arkansas, where "they would have a field day" with him because no blacks lived there. Trial Transcript at 39. In the winter before Delph quit Dr. Pepper, Orosz told Delph that he (Orosz) had been asked to join the Ku Klux Klan and "[t]hat he [Orosz] didn't want to tell the guy that he had one working for him, a black guy." Id. Orosz also told Delph that not many "black guys" had jobs like Delph's, and because he was black he should work harder. Id. at 68.

According to the testimony, there was also a steady barrage of racial name-calling at the facility. Although the time when some of the incidents took place could not be pinpointed, Delph testified that they occurred right up until the time he terminated his employment with Dr. Pepper. There was evidence that Orosz called Delph "black boy" rather than using his name at sales meetings and in the presence of Delph's co-workers, and otherwise on a regular basis. Anspach also used racial epithets when talking to and referring to Delph, including "nigger," "black boy," "token

black boy," and "my little black boy." Id. at 33, 187. Delph described in particular one occasion when Anspach was directing Delph as Delph was backing up his truck at a customer's store. Anspach told Delph "to bring your ass, nigger, bring your ass." Id. at 33. Anspach regularly used the phrase "bring your ass, nigger" to Delph, often in the presence of Delph's colleagues, until Anspach was fired in April 1991. There also was testimony from Delph's coworkers that they, too, used racial slurs and told racial jokes in the office and the warehouse, in the presence of Delph. Orosz and Anspach often were present as well, and said nothing about the offensive talk. Customers of Dr. Pepper also testified that they heard both Orosz and Anspach use racial epithets when referring to Delph.

There was evidence regarding several incidents involving Delph and his employer that do not have racial overtones, but that Delph nevertheless claims were evidence of racial animus on the part of Dr. Pepper. The court agreed that some of these episodes were discriminatory, but specifically found that others were not.

One incident that Delph found particularly distressing involved the destruction of company property. Dr. Pepper route salesmen were given computers and printers to use in their jobs. Pursuant to a written, two-year-old policy, Delph acknowledged when he was issued the equipment that he would be expected to pay to replace the units if they were lost, or to pay $50 if his computer or printer would not work because of employee abuse or neglect. Delph accidentally backed over his printer with his truck in August 1990 and destroyed it. He was required to pay more than $900 for a replacement,[2] with twenty dollars per week withheld from his paycheck until the debt was paid. After Delph was told of the fine, he appealed to the company's main office in Paragould and claimed the action was racially motivated. The assessment was sustained. The court concluded that this action on the part of Dr. Pepper was racially

_____

[2]Initially Delph was told he owed $1000. But when he asked for the remains of the printer he had destroyed, the amount was lowered.

motivated because similarly situated white employees were not treated so harshly. The "similarly situated" white employees, however, had not destroyed their computers or printers, but had negligently damaged company vehicles, which were insured. (The computers and printers were not insured.) These employees were not required to pay anything to repair the vehicles, notwithstanding that collision insurance coverage on the vehicles likely carried a deductible, an out-of-pocket expense to the company.

On another occasion, in October 1990, Delph received a "write-up" (a formal written warning) from Anspach concerning an inadequately stocked vending machine on Delph's route and insufficient supplies of soft drinks at Wal-Mart at the beginning of a weekend, with a notation that Delph needed to improve his attitude. The court found that it was not only unfair criticism but also was racially motivated, "[g]iven the other evidence about Mr. Anspach's clear racial animus." Transcript of Findings of Fact and Conclusions of Law at 20.

Then in March 1991, Delph received a three-day suspension for insubordinate behavior when dealing with Orosz. On the day in question, Delph had returned to the warehouse without making his afternoon stop at Wal-Mart. (He ordinarily made two stops at the store each day because it was such a high-volume account--one first thing in the morning and again last thing in the afternoon.) Delph was having vehicle trouble, and had planned to service the account in his personal vehicle that evening. But Orosz stopped in at Wal-Mart in the afternoon and called Delph at the warehouse when he saw that the account had not been serviced. As Delph tried to explain why he had not been to the store, Orosz suspended him and Delph hung up on Orosz. When Orosz called back, Delph refused to speak to him. (Orosz claims it was only then that Delph was suspended for three days.) Delph filed a grievance with the main office. The processing of the grievance was delayed, and Delph called the office in Paragould and relayed his belief that Dr. Pepper's actions were racially motivated. The grievance was investigated and denied. The court concluded that the suspension was not discriminatory.

Delph complained about the number of notes in his personnel file that related to Delph's servicing of his accounts. Generally, these were phone messages from his accounts, often requesting additional product. As the District Court found, however, only a handful of them could realistically be described as complaints about his work, and there is no indication in the record that they were the result of racial discrimination.

Delph also testified about miscellaneous incidents that he says involved discrimination based on race. In January 1991, Orosz gave Delph a written warning for insufficient effort in calling on new accounts, although there apparently was no follow-up or discipline as a result of the write-up. Delph requested that he be given extra help when it was available because he was responsible for the high-volume Wal-Mart account. Only rarely did Orosz assign extra help to Delph. According to Delph, Orosz expected Delph to deliver out-of-date or nearly out-of-date soft drinks to Wal-Mart, an important account to Delph, because the store had the sales volume to move the product quickly. Delph refused. Delph also believed that he was cheated out of prizes he should have won in sales contests, although there was no evidence to corroborate that contention. The court did not find that any of these situations suggested racial discrimination by Dr. Pepper.

Delph was offered employment as a route salesman for Pepsi, located in Cape Girardeau, Missouri, in February 1992, and declined the opportunity. When offered the job again in May he accepted, although it meant taking a cut in pay. When Delph left Dr. Pepper in June 1992, he gave as one reason for taking the job with Pepsi the fact that the family wanted to move to Cape Girardeau, Missouri, so that his wife could attend nursing school there. She did not attend school, but she did take a job with a hospital there. Delph left Pepsi early in 1993, and then later found a construction job that paid him more money.

On October 26, 1992, Delph filed a charge of discrimination with the Equal Employment Opportunity Commission and the Missouri Commission on Human Rights.

He filed suit in federal court on May 17, 1994. The case was tried to a judge sitting without a jury by consent of the parties. After a two-day trial, on September 19, 1996, the court announced its findings of fact and conclusions of law from the bench. The court found that Delph had been constructively discharged and awarded him back pay, compensatory damages, punitive damages, and attorney fees and costs.

II.

For its first issue on appeal, Dr. Pepper argues that the court erred in finding that Delph was constructively discharged. The District Court found that Delph was subjected to a racially hostile work environment up until the time he resigned from Dr. Pepper, and that his resignation met the criteria under Title VII jurisprudence to have been a constructive discharge. We review the court's findings for clear error. See E.E.O.C. v. Delight Wholesale Co., 973 F.2d 664, 669 (8th Cir. 1992).

"A constructive discharge occurs when an employer renders the employee's working conditions intolerable, forcing the employee to quit." Kimzey v. Wal-Mart Stores, Inc., 107 F.3d 568, 574 (8th Cir. 1997). Behavior that can be characterized as "merely offensive" is not actionable, but "a tangible psychological injury" on the part of the employee is not required for the employer's behavior to be illegal. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). The conduct complained of must have been "severe or pervasive enough to create an objectively hostile or abusive work environment--an environment that a reasonable person would find hostile or abusive--" if the plaintiff is to succeed. Id. In addition, "the victim [must] subjectively perceive the environment to be abusive," or the conduct at issue cannot be said to have "actually altered the conditions of the victim's employment, and there is no Title VII violation." Id. at 21-22; see also Kimzey, 107 F.3d at 573. Further, we have held that the employer's actions leading to the decision to quit must have been deliberate, that is, they "must have been taken with the intention of forcing the employee to quit." Johnson v. Bunny Bread Co., 646 F.2d 1250, 1256 (8th Cir. 1981). In the absence of

-7-

conscious intent (which Dr. Pepper in fact asserts is lacking here), the intention element may nevertheless be proved with a showing that the employee's "resignation was a reasonably foreseeable consequence" of the racially hostile atmosphere of his workplace. Hukkanen v. International Union of Operating Eng'rs Local 101, 3 F.3d 281, 285 (8th Cir. 1993).

## A.

Dr. Pepper contends that the court's finding of constructive discharge was error because the District Court improperly considered--and relied on--evidence of certain nondiscriminatory conduct that occurred during Delph's two years of work for Dr. Pepper. The court specifically found that the notes in Delph's file concerning customer requests or comments, the write-up concerning Delph's failure to call on new accounts, and the three-day suspension were not racially motivated. Nevertheless, citing these incidents, the court held that "it was reasonable for plaintiff to believe that he was being picked on because of his race, and this supports the finding of a constructive discharge." Transcript of Findings of Fact and Conclusions of Law at 21. Dr. Pepper claims that this was error. If the court used legal (that is, nondiscriminatory) actions of the employer to satisfy the objective standard of constructive discharge, we would agree. It would be improper for a court to use a plaintiff's perception of what are, as a matter of law, nondiscriminatory and perfectly legal actions in order to find that the workplace would have been hostile or abusive to the reasonable person *because of illegal racial harassment*. But as noted above, there is a subjective aspect to the constructive discharge inquiry as well as an objective one. To the extent that the court used the incidents in question to conclude that Delph had satisfied his burden of proving that he met the subjective standard, then a finding that Delph was *sincere* in believing that the incidents in question were discriminatory was not error. See West v. Marion Merrell Dow, Inc., 54 F.3d 493, 498 (8th Cir. 1995). But Delph's subjective belief that these actions were discriminatory is irrelevant to the objective inquiry-- whether a reasonable person would find the Dr. Pepper workplace hostile--and

therefore the court's finding that Delph's belief was "*reasonable*" is troubling. Thus, when we address Dr. Pepper's sufficiency argument infra Part II.C., we will not consider the nondiscriminatory actions of Dr. Pepper as we evaluate whether Delph presented sufficient evidence to prove that a reasonable person would find the environment at Dr. Pepper intolerable.[3]

Moreover, we conclude that the court erred in finding that the incident with the computer printer and Anspach's October 1990 write-up of Delph (concerning inadequately stocked customers and Delph's "attitude") were the result of discrimination. The white employees, who negligently damaged insured company vehicles, and Delph, who negligently destroyed his computer printer, were not similarly situated.[4] As for Anspach's October 1990 write-up regarding Delph's "attitude," no evidence was presented that Delph was treated differently from similarly situated white salespersons. Notwithstanding every indication in the record that Anspach was racist, we are doubtful that this incident can be used to prove Dr. Pepper's liability for discrimination when there is no implication that this was disparate treatment based on race. In any event, it is not necessary for us to consider either of these incidents in

---

[3]Whether Delph subjectively believed the workplace at Dr. Pepper to be racially abusive is not an issue on appeal.

[4]The District Court also thought the policy was not applied to Delph as promulgated, because he did not lose the printer but only damaged it. The policy does say, "If the equipment is lost, the following [$1000 per computer or printer unit] will be charged to the person losing the equipment." Memorandum of Aug. 31, 1988 (re: Norand Equipment Maintenance). But it is clear from the language of the policy that the lesser $50 charge for abuse or neglect was intended to apply when the equipment was repairable: "If the units will not work due to abuse or neglect (soda, paper clips, rain, etc. in the units), a $50 fee will be assessed for each unit." Id. When Delph destroyed his printer, it was effectively "lost." In any event, there was no evidence that anyone other than Delph had destroyed, damaged, or permanently lost a computer or printer, and therefore no evidence that the policy was enforced differently based on race.

order to conclude that there is sufficient evidence of constructive discharge in the record to affirm the District Court.  See supra Part II.C.

B.

Dr. Pepper states that any claims Delph may have concerning discriminatory behavior that occurred before December 31, 1991, are barred because Delph's administrative charge was not timely as to such acts.  Because, as the company argues, the conduct pre-dating 1992 is time-barred and therefore not itself actionable, the evidence of it cannot be used to support Delph's claim of harassment.  We disagree.  "[E]vidence of a hostile environment must not be compartmentalized, but must instead be based on the totality of circumstances of the entire hostile work environment."  Gillming v. Simmons Indus., 91 F.3d 1168, 1172 (8th Cir. 1996).  Delph complains of a hostile environment throughout the time he was employed by Dr. Pepper, and is not seeking damages for discrete discriminatory acts.  "A hostile work environment is an ongoing nightmare for the employee victim, in legal parlance, a 'continuing violation.'"  Gipson v. KAS Snacktime Co., 83 F.3d 225, 229 (8th Cir. 1996).  The evidence here demonstrates a classic continuing violation--Delph was called racist names and racial comments were made to him throughout his tenure with the company.  They were not infrequent and were scattered throughout his two years with the company.  Although Anspach, one of the worst perpetrators of the harassment, was terminated from Dr. Pepper in April 1991, Orosz--the manager of the facility--remained and the abuse continued.  The evidence of incidents before 1992 not only demonstrated the ongoing pattern of racial harassment, but also was relevant in resolving the ultimate question of whether the workplace at Dr. Pepper was so racially abusive and hostile that a reasonable employee would feel compelled to quit his job.  See Kimzey, 107 F.3d at 573.  The court did not err in considering all racial incidents that occurred during Delph's employment with Dr. Pepper when evaluating whether he suffered a constructive discharge.

C.

We come then to the question of whether the evidence that is properly considered in this case is sufficient to prove that Delph was constructively discharged. As discussed above, we consider only the evidence of racial epithets and the overt racial tone of certain comments as proof of his constructive discharge. The question before us is whether in these circumstances the manifest racial harassment in the workplace that we have described was so severe or pervasive that it would be reasonably foreseeable that an employee subjected to it would resign. We hold that it was.

There are certain aspects of the conduct at issue here that compel the result we reach today. First, on many (if not most) of the occasions recounted in the evidence, it was Delph's immediate supervisor (Anspach) or the most senior employee in the Poplar Bluff office (Orosz) who made the offensive comments. The two supervisors were primarily responsible for creating and maintaining the racially hostile atmosphere at Dr. Pepper, which makes the behavior all the more egregious.[5] See Rodgers v. Western-Southern Life Ins. Co., 12 F.3d 668, 677 (7th Cir. 1993); cf. Erebia v. Chrysler Plastic Prods. Corp., 772 F.2d 1250, 1260 (6th Cir. 1985) ("Racial harassment directed at an employee by a single supervisor can sufficiently poison the employee's working atmosphere, since a supervisor can dominate the workplace with respect to his subordinate.") (Kennedy, J., dissenting), cert. denied, 475 U.S. 1015 (1986).

---

[5]This also explains, and in this case excuses, Delph's failure to complain about the harassment to his supervisors. See Briones v. Runyon, 101 F.3d 287, 291-92 (2d Cir. 1996). There would be little point in going to one's supervisors to challenge the racial atmosphere when it is those same supervisors who are creating and perpetuating it. Moreover, the racial slurs and comments used by Anspach and Orosz were patently offensive and no one, certainly not a supervisor, should need to be told as much.

Further, this is not a situation where racial jokes and innuendo were merely bandied about the workplace with no particular target, or where Delph was called names behind his back but was unaware of it. Much of the racially hostile language not only was used in Delph's presence, but was directed at him. Cf. Tidwell, 93 F.3d at 496 n.5 (noting that an "instance of insulting, racist language does not create an intolerable workplace" for plaintiff where plaintiff neither heard nor knew of the racist comment). In addition, we think the racially charged nature of the comments is significant to a finding of constructive discharge. Delph was called some of the most offensive of racist epithets. "[T]he use of the word [nigger] even in jest could be evidence of racial antipathy." McKnight v. General Motors Corp., 908 F.2d 104, 114 (7th Cir. 1990), cert. denied, 499 U.S. 919 (1991); see also Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ., 926 F.2d 505, 514 (6th Cir.) ("His use of the word 'niggers' cannot be characterized as harmless or casual.") (citing McKnight, 908 F.2d at 114), cert. denied, 501 U.S. 1261 (1991). Similarly offensive and racially charged was Orosz's discussion of the Ku Klux Klan's invitation to him to join the organization, and his reaction--which he reported directly to Delph--that he did not want to tell the Klan he had "one" working for him. See Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1082 (3d Cir. 1996) (describing as "inherently racist remarks" such appellations as "another one," "one of them," "that one in there," and "all of you" when used to describe blacks).

This situation involved more than "a few isolated racial slurs." Powell v. Missouri State Highway & Transp. Dep't, 822 F.2d 798, 801 (8th Cir. 1987). The harassment Delph and others described was sufficiently severe or pervasive--both objectively and subjectively--to warrant a finding of constructive discharge. We conclude, even without considering any objectively nondiscriminatory conduct contained in the record, that Delph made a sufficient showing that he was subjected to a racially hostile workplace environment a reasonable person would find intolerable, and that he did find it intolerable, and thus his resignation was indeed a constructive discharge.

III.

Dr. Pepper contends there is inadequate evidence to support the award of compensatory damages. We conclude that, although the evidence supports the award of some compensatory damages, the amount of the award must be reduced.

The District Court found that Delph "did suffer emotional distress, pain and suffering, that he suffered humiliation, and degradation, and that this resulted in physical manifestations, including the headaches and digestive problems." Transcript of Findings of Fact and Conclusions of Law at 27. The court concluded that $150,000 in compensatory damages was an appropriate amount,[6] but the record does not support such a large award. Delph testified that he was "very hurt," "[e]motionally hurt." Transcript at 90. But he also said he did not know what else he was feeling, "other than hurt." Id. at 91. When pressed by his counsel, Delph said, "I had headaches, symptoms of headaches, hurt in my stomach, and--" Id. Delph said he resigned because he "was under a lot of pressure, and just couldn't take it no more." Id. at 92. He later testified that he consulted a physician because he "was experiencing headaches, ulcer-like symptoms . . . and that's about it." Id. at 99. He said he was experiencing these symptoms while working for Dr. Pepper, but he did not seek medical attention until he left Dr. Pepper, moved to Cape Girardeau, and began

---

[6]The court actually found that Delph was damaged in the amount of $200,000 under Title VII, but that only $150,000 in damages was suffered after November 21, 1991, the effective date of the Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071, which expanded the remedies available to the successful Title VII plaintiff. See Landgraf v. USI Film Prods., 511 U.S. 244, 286 (1994) (holding that the section of the Act permitting recovery of compensatory and punitive damages is not retroactive). The court also found that Delph suffered damages under the Missouri Human Rights Act in the amount of $100,000 during the relevant statutory damages period. Because the amount under state law would be duplicative of the amount awarded under Title VII, as both are to compensate for the same harm, the court awarded Delph the Title VII damages, the larger amount.

working for Pepsi.  The statement of a neurologist who saw Delph on referral in February 1993, eight months after he left Dr. Pepper, was received in evidence during the trial.  The report stated that Delph at that time complained of headaches, chest pain, and dizziness in the year and a half before seeing the neurologist, and that he said he had been having increasing difficulty with headaches in the previous six or seven months, that is, while he was working at Pepsi.  The report was inconclusive as to the cause.

The only other testimony concerning Delph's emotional distress came from his wife, who said, "He was very withdrawn. . . .  [H]e was upset a lot of time."  Id. at 215.  She said that after Delph started working for Pepsi, "[h]e was still unhappy . . . on the occasions that he had to go to Poplar Bluff" to service accounts for Pepsi because of the chance that he might run into Orosz.  Id. at 217.

This evidence does not justify an award of $150,000 in compensatory damages. Although "[m]edical or other expert evidence is not required to prove emotional distress" in these cases, Kim v. Nash Finch Co., 123 F.3d 1046, 1065 (8th Cir. 1997), the testimony of Delph and his wife does not describe the severe emotional distress that would warrant such a large award of damages.  Both the emotional and physical complaints are vague and ill-defined, and are not characterized as especially intense. Having considered the entire record, we hold that the District Court clearly erred in awarding such a large amount of damages to Delph, and therefore reduce the award of compensatory damages to $50,000.  See Vigoro Indus., Inc. v. Crisp, 82 F.3d 785, 789 (8th Cir. 1996) (standard of review).

IV.

Dr. Pepper also challenges the award of punitive damages, arguing that Delph did not prove that Dr. Pepper "engaged in a discriminatory practice . . . with malice or with reckless indifference to the federally protected rights of an aggrieved individual."

-14-

42 U.S.C. § 1981a(b)(1) (1994). We disagree. We think there is more than enough evidence, not necessarily of malice, but at least of reckless indifference to Delph's federally protected right to be free from a racially hostile workplace. Apparently neither Anspach nor Orosz had received training on discrimination in the workplace, but one simply does not refer to black employees as did Delph's two supervisors without knowing that such language would offend a reasonable person in Delph's position. Clearly, Anspach and Orosz were indifferent to Delph's rights as an employee of Dr. Pepper, and in the circumstances, we think recklessly so. The fact that these two men, from all indications the worst offenders, were Delph's supervisors supports the finding that the conduct was reckless. See Kim, 123 F.3d at 1066. We agree with the District Court that the tacit inference in the testimony from some of the witnesses that this is just the way things are done in southeastern Missouri, and that it was all just good fun among good fellows, is unacceptable.

Dr. Pepper also argues that the amount of punitive damages is grossly excessive. We disagree, especially in view of the overall reduction in the damages awarded to Delph as a result of this appeal, see supra Part III. The amount is sufficient to punish the actions of Dr. Pepper without being unreasonable, and is not out of proportion to Delph's compensatory damages, even after our reduction of those damages to $50,000. See Dean v. Olibas, No. 96-4245, 1997 WL 716423, at *5-6 (8th Cir. Nov. 19, 1997).

We affirm the award of $50,000 in punitive damages to Delph.

V.

Finally, Dr. Pepper challenges the award of attorney fees. Delph sought $114,942.50 in attorney fees. The District Court awarded only $88,800, reducing the hourly rate of local counsel from $200 to $150 per hour, and that of trial counsel from $250 to $200 per hour. The court otherwise found that counsel for Delph "achieved an exceptional result . . . and prevailed in all material respects." Memorandum and

Order of Jan. 6, 1997, at 3. The court did not deny reimbursement for any of the hours claimed (except for the time spent preparing the fee application) and found that the work of the three attorneys was not needlessly duplicative. Dr. Pepper seeks to have the fee award reduced to not more than $55,778.

We will tamper with a district court's award of attorney fees only if there has been an abuse of discretion. See Peanick v. Morris, 96 F.3d 316, 323 (8th Cir. 1996). "The District Court has discretion in determining the amount of the award because it has the greatest exposure to, and therefore understanding of, the proceedings before it." Shrader v. OMC Aluminum Boat Group, Inc., No. 97-1475WM, 1997 WL 685410, at *2 (8th Cir. Oct. 31, 1997). The court here obviously examined the fee request with some care, and did reduce the hourly rates proposed by counsel. Dr. Pepper argues, however, that those rates are still too high. Dr. Pepper also claims that "[m]uch of the time for which Plaintiff sought attorneys' fees was excessive, unreasonable and duplicative." Brief for Appellant at 48. We have reviewed the parties' submissions to the District Court concerning these matters, and we cannot say that the court abused its discretion.

A closer call for us is the fact that three attorneys are seeking fees. We have no problem with Delph having both local and trial counsel. It is the second trial counsel that is of concern to us, but we note that he has billed only 62 hours deemed recoverable by the court, compared with 325 for lead trial counsel. The second counsel's billings do not appear to be duplicative of his colleague's work. Moreover, he was an active participant at the trial, examining and cross-examining a number of witnesses. On balance, we see no abuse of discretion in the amount of attorney fees awarded by the court and we affirm the order.

## VI.

We affirm the District Court's finding that the racially hostile environment at Dr. Pepper's Poplar Bluff facility resulted in Delph's constructive discharge. The award of back pay was not appealed and is unaffected by this opinion. The award of compensatory damages is reduced to $50,000, and the punitive damages award of $50,000 is affirmed. In case number 97-1160, the award of attorney fees is affirmed.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT