**Jerrie GRAY, Plaintiff,**

v.

**TYSON FOODS, INC., Defendant.**

No. 97–4036–CV–C–9.

United States District Court,
W.D. Missouri,
Central Division.

March 23, 1999.

6, 1993 to March 16, 1995. During that time, plaintiff was exposed to comments, gestures, and physical contact that she found to be offensive and believed constituted sexual harassment.

On February 6, 1997, plaintiff filed suit in this court seeking recovery under both Title VII (42 U.S.C. § 2000e–5) and the Missouri Human Rights Act (MHRA) (Mo. Rev.Stat. § 213.055). Ultimately, a jury found in favor of plaintiff and awarded $40,000 for back pay, $185,000 for compensatory damages, and $800,000 for punitive damages.

On August 31, 1998, I held a hearing on defendant's post-trial motions for judgment as a matter of law, for a new trial, and for remittitur.

Barbara J. Robertson, The Popham Law Firm, P.C., Kansas City, MO, Dennis E. Egan, I, The Popham Law Firm, P.C., Kansas City, MO, for plaintiff.

Paul D. Seyferth, Robert Charles Johnson, Husch & Eppenberger, LLC, Kansas City, MO, for defendant.

*ORDER GRANTING IN PART AND DENYING IN PART THE DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW; IN THE ALTERNATIVE, GRANTING DEFENDANT'S MOTION FOR A NEW TRIAL; AND, IN THE ALTERNATIVE, GRANTING DEFENDANT'S MOTION FOR REMITTITUR*

BARTLETT, District Judge.

## I.

### *BACKGROUND*

Jerrie Gray worked at the Tyson Foods facility in Marshall, Missouri from August

## II.

### *DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW*

#### *The Parties' Positions*

In its motion for judgment as a matter of law, defendant claims there was no evidence to support the verdict in favor of the plaintiff and no evidence to support the damages awarded by the jury. Defendant contends plaintiff failed to present evidence that she was constructively discharged because of sexual harassment. Defendant also claims that plaintiff failed to present evidence that she was subjected to a hostile work environment. Specifically, defendant argues that the conduct plaintiff complained of was not unwelcome, the complained about conduct was not based on sex, the complained about conduct did not affect a term, condition, or privilege of employment, and that proper remedial action was taken in response to any complaint by plaintiff of sexual harassment.

With regard to the jury's assessment of damages, the defendant claims the evi-

dence was insufficient to support an award of either compensatory damages or punitive damages.

In response, plaintiff argues that there was evidence that the plaintiff quit as a direct result of the hostile work environment. Plaintiff contends that there was evidence that the complained about conduct was unwelcome and that the plaintiff was subjected to the complained about conduct because plaintiff is a woman. Finally, plaintiff argues that she repeatedly complained about her treatment and nothing was done to remedy the problem.

Plaintiff defends the jury's compensatory and punitive damage awards by calling attention to testimony by the plaintiff and a psychologist about the emotional injuries suffered by plaintiff as a result of sexual harassment. In addition, plaintiff argues that the amount of punitive damages is not inconsistent with the punitive damages awarded and affirmed on appeal in other cases.

### Standard for Judgement as a Matter of Law

▮▮ "The law places a high standard on overturning a jury verdict." *Hathaway v. Runyon*, 132 F.3d 1214, 1220 (8th Cir. 1997). Judgment as a matter of law "is in order only where the evidence points all one way and is susceptible to no reasonable inferences sustaining the position of the nonmoving party." *Meisner v. United States*, 133 F.3d 654, 656 (8th Cir.1998). The court must determine if sufficient evidence exists to support the verdict returned by the jury. *Cowan v. Strafford R–VI School Dist.*, 140 F.3d 1153, 1157 (8th Cir.1998). All evidence must be viewed in the light most favorable to the verdict. *Id.* "This means that the court must assume as proven all facts that the nonmoving party's evidence tended to show, give the nonmovant the benefit of all reasonable inferences, and assume that all conflicts in the evidence were resolved in the nonmovant's favor." *Cross v. Cleaver*, 142 F.3d 1059, 1066 (8th Cir.1998). The court cannot "engage in a 'weighing or evaluation of the evidence or consider questions of credibility.'" *Cowan*, 140 F.3d at 1157 (quoting *White v. Pence*, 961 F.2d 776, 779 (8th Cir.1992)). The court simply asks whether "sufficient evidence was produced to support a reasonable finding on each of the elements of the plaintiff's claim or claims." *Cross*, 142 F.3d at 1066.

### Application of the Standard for Judgment as a Matter of Law to This Case

According to the Eighth Circuit Court of Appeals, to prevail on a constructive discharge claim, there must be evidence that the former employer deliberatively created

intolerable working conditions with the intention of forcing the employee to quit and the employee must quit. The plaintiff can satisfy the intent requirement by demonstrating that [she] quit as a reasonably foreseeable consequence of the employer's discriminatory actions.

A constructive discharge arises only when a reasonable person would find the conditions of employment intolerable. To act reasonably, an employee has an obligation not to assume the worst and not to jump to conclusions too quickly. An employee who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged.

*Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 494 (8th Cir.1996). Although a constructive discharge claim requires more than just a Title VII violation, the Eighth Circuit Court of Appeals recognizes constructive discharge when there is a "lack of recourse within the employer's organization." *Howard v. Burns Bros., Inc.*, 149 F.3d 835, 842 (8th Cir. 1998). "If an employee quits because she reasonably believes there is no chance for fair treatment, there has been a constructive discharge." *Kimzey v. Wal–Mart Stores, Inc.*, 107 F.3d 568, 574 (8th cir.1997).

▮▮ Defendant focuses on the plaintiff's testimony where she said she was angry

and not going back to work because she was "doing three peoples' jobs and getting paid for one, and then I get yelled at." This is not, however, the only testimony the jury could have used in deciding why plaintiff quit her job. Jamie Barnett testified that, during the argument leading to plaintiff quitting her job, they "didn't really get down to the bottom of ... the reason why we came up [to the office] because Jerrie proceeded bringing back stuff in the past that, uh, she said I failed to do." Given the evidence of prior complaints, lack of action by management, and that just prior to quitting plaintiff made reference to things her supervisor failed to do, the jury concluded reasonably that the plaintiff quit as a reasonably foreseeable consequence of a pattern of discriminatory treatment, that plaintiff was not unreasonable in finding the conditions intolerable and that plaintiff reasonably believed there was no chance for fair treatment.

Therefore, applying the standard for considering a motion for judgment as a matter of law, there was sufficient evidence to support reasonably the jury's conclusion that plaintiff was constructively discharged.

█ Defendant argues plaintiff failed to prove she was subjected to a hostile work environment. To prevail on a hostile work environment claim a plaintiff must persuade the trier of fact that:

(1) she belongs to a protected group; (2) she was subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) [defendant] knew or should have known of the harassment and failed to take proper remedial action.

*Kopp v. Samaritan Health System, Inc.,* 13 F.3d 264, 269 (8th Cir.1993).

Defendant claims any sexual harassment that might have occurred was not unwelcome to the plaintiff. Defendant points to evidence about plaintiff's language, gestures, and conduct in arguing that the complained about conduct was not unwelcome.

"[T]he question whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact...." *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2406, 91 L.Ed.2d 49 (1986).

█ Again applying the proper standard for ruling a motion for judgment as a matter of law, there was sufficient evidence to support reasonably the jury's conclusion that the sexual harassment was unwelcome. Although there was evidence that the plaintiff voluntarily participated in the activity she now complains of and that she enjoyed it, there was also evidence and reasonable inferences from the evidence supporting the conclusion that the complained about conduct was unwelcome. The jury could have concluded reasonably that a woman in the work environment existing at defendant's plant had to appear to enjoy participating in the hostile conduct in order to maintain any status in that workplace. The jury could have concluded that despite plaintiff's involuntary participation, she, in fact, found the conduct offensive and unwelcome.

Defendant argues plaintiff failed to present evidence that the complained about conduct was based upon plaintiff's sex. Again applying the proper standard for ruling a motion for judgment as a matter of law, there were facts presented such as the content of the speech and the nature of the conduct that would support the jury's conclusion that the complained about conduct was based on plaintiff's sex.

█ Defendant also claims plaintiff failed to present evidence that the harassment affected a term, condition or privilege of employment.

"Harassment affects a term, condition, or privilege of employment if it is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and

create an abusive working environment.' " *Howard*, 149 F.3d 835, 840.

To support its position that the harassment could not have affected any term, condition, or privilege of her employment, defendant cites plaintiff's testimony that she was a good employee.

The testimony about the verbal and physical conduct visited upon plaintiff was sufficient to support the jury's determination that the harassment was so severe and pervasive that it altered the conditions of employment by creating an abusive working environment. The jury could have concluded that plaintiff's good work performance was achieved while enduring an abusive work environment.

█ In its final point on the hostile work environment claim, defendant argues that plaintiff did not present facts showing that defendant, when advised of the complained about conduct, failed to take appropriate remedial action to correct the complaint.

"Once the plaintiff makes a submissible case, the promptness and adequacy of the employers's response to a complaint of harassment are fact questions for the jury to resolve." *Howard*, 149 F.3d 835, 841.

Again applying the proper standard for ruling a motion for judgment as a matter of law, there was evidence that a reasonable jury could have relied upon in concluding that whatever the defendant did was ineffective.

Defendant claims that the evidence was insufficient to support the compensatory and punitive damages awarded by the jury.

The $185,000 awarded by the jury for compensatory damages is excessive and bears no reasonable relation to evidence presented about damages plaintiff suffered as a direct result of defendant's conduct. Similarly, the amount of punitive damages awarded far exceeds the purpose for punitive damages as set forth in Instruction No. 13 and is not supported by sufficient evidence.

In addition to the insufficiency of the evidence to support the damage awards, the amount of damages awarded suggests that the jury was influenced by something other than admissible evidence.

Based on my observations during the trial, the atmosphere in the courtroom underwent a dramatic change during and as a result of the testimony of Maggie Bunch.

During direct examination by plaintiff's counsel, Bunch on two occasions volunteered that several Tyson employees quit their jobs because of sexual harassment. Each time I instructed the jury to disregard this testimony. Nevertheless, the defendant was unquestionably damaged by this improper testimony.

During the direct examination of Bunch, the jury was instructed four times that they were to disregard and not consider testimony they had already heard. (Bunch's desire to tell her story regardless of my rulings on objections was aggravated by counsel for plaintiff's failure to follow my directions and rulings. Counsel contributed to rather than reduced a situation which we all realized was extremely volatile.)

I believed at the time and upon reflection am still convinced that my instructions to disregard the improper testimony were ineffectual. The content of the improper testimony plus the number of times where instruction was necessary made it impossible to erase the prejudice.

The instructions to disregard were ineffectual in part because of Bunch's verbal and non-verbal behavior graphically demonstrating her frustration at not being able to tell her story. At one point, in response to an objection by defense counsel, Bunch asked, "[m]ay I say something here?" Although I explained to Bunch her role as a witness, the jury was left with the impression that Bunch was being prevented from telling everything she knew about the activity at defendant's plant.

In addition to the witness's verbal and nonverbal expressions of frustration in front of the jury at not being able to tell her story, at the end of the trial day Bunch engaged in an emotional and angry outburst in the courtroom after the jury left. Bunch continued the tirade in the hallway outside the courtroom in the presence of some of the departing jurors. In order to find out what had taken place in the hallway outside of my presence, I had Bunch return to the courtroom. Initially she told me she was upset by having to return to testify the next day because she had started a new job. She went on to express her frustration with not being able to completely tell her story to the jury. Ultimately she blurted out an obscenity and stormed from the courtroom. (Had I not been focused on doing everything I could to finish the trial fairly for both parties, I should have considered some penalty for her behavior because it was so inappropriate.)

The following day I interviewed each juror individually to determine what, if anything unusual, they might have seen or heard as they were leaving the courthouse the evening before. Juror Reven accompanied Bunch on the elevator. Reven said "she was very mad because she couldn't—wasn't allowed to talk, wasn't allow to say what she wanted to say." Tr. Juror Interviews at 20. Although Reven said Bunch's behavior would not influence her, it was obvious from observing Reven that Bunch's out of court behavior impressed Reven about how strongly Bunch felt about her version of events. As a result of Bunch's inappropriate testimony in the courtroom, Reven had a good idea what Bunch wanted to say which had been emphasized by Bunch's behavior outside the courtroom.

Juror Grellner saw Bunch outside the courtroom and saw that Bunch was angry. Jurors Grellner and Buell used the stairs rather than the elevator to avoid Bunch. Grellner thought that Bunch was angry because she wanted to say more but thought that Bunch would have the opportunity to say more when she came back to complete her testimony.

Juror Runkel stated that he would have difficulty following my instructions to disregard Bunch's inadmissible testimony. Runkel's difficulty in following my instruction to disregard was "because I was taking it as a real credible witness and I mean, you know, she says something like that, you know, it's hard for me. You know what I mean? It really is because I really believed what she was saying and that's going to be hard for me...." Tr. Juror Interviews at 8–9. Runkel never committed to disregard Bunch's inadmissible testimony. The most that he agreed to do was to try to disregard Bunch's inadmissible opinion. *See* Tr. Juror Interviews at 9–10.

Shortly after my first interview with Runkel, he requested a second interview. During the second interview, he recalled how angry Bunch was outside the courtroom and what she was angry about. Compare Tr. Juror Interviews at 8 to Tr. Juror Interviews at 25–27. Runkel's evasiveness and what he said leaves me with the firm conviction that he was influenced by Bunch's improper opinion testimony, that he was impressed by how upset she was by not being able to tell her story based in part on his observation of her behavior outside the courtroom, and that he would be unable to disregard Bunch's improper testimony even though I had instructed him to do so.

Two other jurors who witnessed Bunch outside the courtroom assured me they could disregard what they had seen outside the courtroom. Based on the number and severity of problems with Bunch inside the courtroom, based on Bunch's behavior outside the courtroom in the presence of the jurors, based on my observation of these jurors during the interviews and based on the amount of damages awarded, I doubt the accuracy of these jurors' statements.

■ Despite the presumption that jurors will follow instructions they are given, *Gee v. Groose,* 110 F.3d 1346, 1349 (8th Cir.1997), in some instances the prejudice is too great to be overcome by giving a curative instruction. *Sanders–El v. Wencewicz,* 987 F.2d 483, 484 (8th Cir.1993). Here, the presumption as it relates to the instructions to disregard Bunch's inappropriate testimony is refuted by the interviews with jurors. Furthermore, the combined impact of Bunch's behavior inside the courtroom in front of the jury and her behavior outside the courtroom in the presence of some jurors created a prejudice too great to be entirely eradicated by the curative instructions.

The improper testimony of witness Bunch, together with her inappropriate behavior both on and off the witness stand in the presence of members of the jury, plus the failure of plaintiff's counsel to control the witness by appropriate questioning, plus counsel's failure to follow my directions intended to help defuse the situation and reduce *unfair* prejudice from Bunch's testimony, caused the jury to return a verdict not entirely based on admissible evidence.

Because there is sufficient admissible evidence to support the jury's verdict in favor of plaintiff, the unfair prejudice caused by the combination of events referred to in the previous paragraph can be corrected by addressing the specific areas of insufficient evidence, i.e., damages. The amount of damages awarded by the jury is where the prejudice resulting from the improper behavior and testimony of witness Bunch had its effect.

■ Applying the proper standard for determining a motion as a matter of law and considering the amount and quality of evidence presented in light of that standard, there was insufficient evidence to support the jury's conclusion that plaintiff suffered $185,0000 in compensatory damages.

Because of the insufficiency of the evidence to support $185,000 in compensatory damages, the amount of damages awarded must have been the result of the prejudice which resulted from Bunch's behavior.

A recent decision by the Eighth Circuit Court of Appeals furnishes a guide as to what would be an appropriate award for compensatory damages. In *Delph v. Dr. Pepper Bottling Co. of Paragould, Inc.,* 130 F.3d 349 (8th Cir.1997), the court reduced the compensatory damage award from $150,000 to $50,000. Plaintiff had testified that he suffered from headaches, dizziness, chest pain, stomach pain, and ulcer-like symptoms. *Id.* at 357. In addition, the plaintiff testified that as a result of the discrimination he was "emotionally hurt," felt added pressure in his job, and was under stress when he had to go to Poplar Bluff because he might run into his former supervisor. *Id.*

The evidence of emotional injury in this case is very similar to the evidence presented in *Delph.* During direct examination the plaintiff testified that she was hysterical, upset and embarrassed after one of the incidents at the plant. In addition, plaintiff testified that she was offended and frustrated by the complained about incidents at the plant. Also, plaintiff testified that after leaving her job at defendant's facility she was "on guard" and became worried that she would see people from the Tyson plant when she was around town.

Plaintiff's expert witness also testified about the harm suffered as a result of experiences at defendant's plant. Dr. Hutchinson explained that plaintiff was "afraid," "extremely frightful," and felt a "sense of hopelessness." In addition, Dr. Hutchinson testified plaintiff demonstrated symptoms of trauma response and that plaintiff had "sustained emotional injury."

Unlike the plaintiff in *Delph,* the plaintiff in this case did not testify about suffering any physical symptoms as the result of her treatment at defendant's plant.

As in *Delph*, the evidence presented on damages in the instant case was too "vague and ill defined" to support the award for compensatory damages. Using the decision in *Delph* as a guide, the evidence and reasonable inferences from the evidence supports no more than $50,000 in compensatory damages.

In addition, defendant attacks the amount of the verdict for punitive damages by claiming that the jury was given an incorrect burden of proof for assessing punitive damages under the Missouri Human Rights Act (MHRA). Specifically, defendant argues that, under Missouri law, punitive damages must be proven by clear and convincing evidence rather than by a preponderance of evidence, the standard given to the jury.

Plaintiff argues that the Missouri case establishing clear and convincing evidence as the burden of proof for punitive damages does not apply to claims brought under the MHRA. Plaintiff asserts that *Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104, 111 (Mo.1996), provides a clear and convincing standard of proof "[f]or *common law* punitive damage claims...." *Id.* (emphasis added). Plaintiff concludes that the higher burden of proof announced does not apply to punitive damage claims under the MHRA because it is not a common law claim.

Defendant responds that effective January 1, 1998, Missouri Approved Instruction (MAI) 3.01, provides that the burden of proof for punitive damages in all cases is clear and convincing evidence. Plaintiff replies that whatever MAI says is procedural and need not be applied in this court.

■■■ This court had supplemental jurisdiction over plaintiff's MHRA claim. When a federal court hears supplemental state law claims, it must apply substantive state law. *Bosley v. Kearney R–1 School Dist.*, 904 F.Supp. 1006, 1025 (W.D.Mo. 1995). Therefore, Missouri substantive law controls the MHRA claim.

■■■ Although the wording of an instruction may be a procedural issue, the proper burden of proof is an issue of substantive law not a procedural issue. *See American Eagle Ins. Co. v. Thompson*, 85 F.3d 327, 330 (8th Cir.1996).

■■■ No court has addressed the burden of proof for punitive damages under the MHRA since the *Rodriguez* decision was announced and the revision to MAI 3.01 became effective. However, two cases cited in the *Rodriquez* decision provide insight as to what the Missouri Supreme Court would do if it were faced with this issue.

In *Menaugh v. Resler Optometry, Inc.*, 799 S.W.2d 71, 76 (Mo.1990), Judge Robertson wrote in a concurring opinion that

> it appears to me that a strong case can be made for requiring a clear and convincing standard for an award of punitive damages. In 1987, the General Assembly adopted Section 510.263, RSMo Cum.Supp.1989, which deals with, among other things, the award of punitive damages. At that time, the General Assembly did not see fit to raise the burden of proof to a clear and convincing standard. Given that the legislature has chosen to address punitive damages generally, but remained silent on the burden of proof, it is my view that this Court ought to defer to the General Assembly's policy choices. *This is not to say that this Court does not have the authority to address this common law question; it does.*

(emphasis added)

Similarly, in *Kansas City v. Keene Corp.*, 855 S.W.2d 360, 378 (Mo.1993) (en banc), Judge Holstein noted in his concurring opinion that one way for Missouri courts to deal with potential problems associated with punitive damage awards is to raise the burden of proof for punitive damages. Judge Holstein went on to say that

> [t]here is a secondary question as to whether a higher standard of proof is prohibited because of the legislative en-

actment of §§ 510.263 and 537.675.... These statutory provisions make no mention of the standard of proof required to establish a punitive damages claim. Prior to *Menaugh* this Court had never spoken on what standard [of] proof was applicable in a punitive damages case. *Menaugh* was decided three years after the enactment of §§ 510.263 and 537.675. Thus it cannot be implied that the legislature intended by their silence to enact a particular standard of proof. *Punitive damages is entirely a product of the common law as developed by the courts of this state. To the extent the common law punitive damages doctrine is not defined, limited, or modified by the legislature, this Court may articulate the standards by which the doctrine will be measured and applied.*

*Id.* (emphasis added).

In *Rodriguez*, the Missouri Supreme Court stated that "[p]unitive damages thus are like other cases requiring the clear and convincing standard of proof: the remedy is so extraordinary or harsh that it should be applied only sparingly." *Rodriguez*, 936 S.W.2d at 110. The Missouri Supreme Court ultimately held that "[b]ecause punitive damages are extraordinary and harsh, this Court concludes that a higher standard of proof is required: For common law punitive damage claims, the evidence must meet the clear and convincing standard of proof." *Id.* at 111.

Under Mo.Rev.Stat. § 213.111.2, part of the MHRA, a plaintiff may recover both actual and punitive damages. Section 213.111.2 does not, however, define the burden of proof for punitive damages. Based on the concurring opinions in *Menaugh* and *Keene*, and on *Rodriguez*, I believe that, absent legislative action to define, limit, or modify the burden of proof for punitive damage claims, the Missouri Supreme Court would hold that punitive damages under the MHRA must be proven by clear and convincing evidence.

The jury instruction given in the instant case required plaintiff to prove facts supporting the claim for punitive damages by a preponderance of the evidence. Because the instruction was an incorrect statement of Missouri law, no amount of punitive damages under the MHRA is lawful. However, the burden of proof given is proper for punitive damages under Title VII. Therefore, any award of punitive damages that exceeds the maximum allowed by Congress under 42 U.S.C. § 1981a for a Title VII claim must be vacated.

During the instruction conference, the proper burden of proof for a punitive damage claim under the MHRA was discussed. Because none of us, including plaintiff's attorney, thought that a punitive damage verdict in excess of $300,000 was a possibility, we agreed that the lower burden of proof would be used in order to simplify the jury instructions. We agreed that should a higher punitive damage verdict be returned by the jury, and if it were determined that a higher burden of proof was required under the MHRA, the amount over the maximum allowed by § 1981a would have to be vacated.

Accordingly, the jury's punitive damage award of $800,000 must be reduced to no more than $250,000 ($300,000 maximum allowed by § 1981a minus $50,000 compensatory damages).

The remaining question is whether there was sufficient evidence presented to allow a reasonable jury to award $250,000 in punitive damages.

"Factors to consider in determining the reasonableness of a punitive damages award include the degree of reprehensibility of the defendant's conduct, the ratio or relationship between the actual harm inflicted on the plaintiff and the punitive damages award, and civil penalties authorized or imposed for comparable conduct." *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1067 (8th Cir.1997) (citing *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 573–75, 116 S.Ct. 1589, 1598–99, 134 L.Ed.2d 809 (1996)).

In *Kimzey, supra,* the court reduced a punitive damages award from $5 million to $350,000 even though the trial court had reduced the jury award from $50 million to $5 million. The court reduced the punitive damage award because there was no evidence of serious sexual assault or quid pro quo harassment. *Id.* at 577. The fact that Wal–Mart had a comprehensive sexual harassment policy together with the fact that the harassment was not known at higher levels in the company weighed in favor of reducing the punitive damage award. *Id.* at 577–78.

■■■ Here, the work place conduct about which plaintiff complained involved crude, sexually explicit comments and gestures by co-workers. With the exception of a crotch grabbing incident, the physical contact complained of involved co-workers running their sharpening steels up plaintiff's leg. Also, there was no evidence that management retaliated against plaintiff. As in *Kimzey,* Tyson had a policy against sexual harassment and there was evidence that at times it resulted in effective action by management. However, the jury could have concluded reasonably that plant management failed to provide plaintiff complete protection from the inappropriate behavior of her fellow employees. As in *Kimzey,* there was no evidence of serious sexual assault or quid pro quo sexual harassment.

Finally, there was no evidence presented concerning the financial status of the defendant. Therefore, there was no way in which the jury could properly assess the amount of punitive damages necessary to punish this defendant.

Considering that $250,000 would be the highest award of punitive damages allowable in this case, considering that the behavior of defendant was not the most egregious behavior imaginable (therefore, the heaviest possible punishment is not reasonable), and considering that no evidence was presented about how large an award is necessary to appropriately punish the defendant, the evidence presented was insuf-

ficient to support a punitive damage award over $100,000. In light of the evidence presented, $100,000 will punish defendant and deter others from similar conduct.

Accordingly, as a matter of law, for the reasons stated, there was insufficient evidence to support an award of compensatory damages greater than $50,000 and insufficient evidence to support an award of punitive damages greater than $100,000.

### III.

### MOTION FOR A NEW TRIAL

#### The Parties' Positions

In the motion for a new trial, defendant identifies five points it claims justify setting aside the jury's verdict in favor of a new trial. First, a mistrial should have been declared because of inadmissible testimony by witness Maggie Bunch as well as Bunch's improper behavior. Defendant contends that, in the context of this case, the curative instructions given were not enough to overcome the prejudice it suffered. Second, the jury heard inadmissible evidence because of erroneous evidentiary rulings. For instance, the jury should not have been allowed to hear testimony from "me too" witnesses. Also, the plaintiff's expert witness should not have been allowed to testify. Third, the jury's verdict was against the weight of the evidence. Fourth, the jury was improperly instructed on the burden of proof for punitive damages under the Missouri Human Rights Act. Fifth, the amount of compensatory and punitive damages awarded by the jury was excessive.

In response, plaintiff claims it was defense counsel who elicited, or at least emphasized, the improper testimony that it complains about now. Plaintiff also contends that plaintiff, not defendant, suffered prejudice as a result Bunch's behavior. Additionally, plaintiff argues that, based on cases decided by the Eighth Circuit Court of Appeals, the testimony by other employees about instances of sexual

harassment and the testimony by the expert witness were properly admitted. Finally, plaintiff believes the jury instruction on punitive damages was correct and the amount of damages awarded in this case is reasonable in light of the evidence.

### Standard for Granting a Motion for New Trial

To justify a new trial, a court must find the result, if allowed to stand, would be a "miscarriage of justice." *White v. Pence,* 961 F.2d 776, 780 (8th Cir.1992). A new trial may be necessary because of trial error, verdicts against the weight of the evidence, or damage awards that are excessive or inadequate. *Gray v. Bicknell,* 86 F.3d 1472, 1480 (8th Cir.1996). Regardless of the cause, for a court to grant a new trial the jury's verdict must go against the "great, clear, or overwhelming weight of the evidence." *Frumkin,* 965 F.2d at 624 (internal quotations omitted) (quoting *White v. Pence,* 961 F.2d 776, 780–82 (8th Cir.1992)).

When deciding whether to grant a new trial, the district court is not allowed to "usurp the functions of the jury" or "set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because the judge[ ] feel[s] that other results are more reasonable." *White,* 961 F.2d at 780. However, on a motion for a new trial, the prevailing party does not have to receive the benefit of every doubt or favorable inference. *Leichihman v. Pickwick Int'l,* 814 F.2d 1263, 1266 (8th Cir.1987). In fact, "[e]ven when *substantial* evidence supports a verdict, the trial court may conclude that there has been a miscarriage of justice." *Id.* at 1267 (emphasis in original).

Although a trial court has the authority to grant a new trial, exercise of this power is not appropriate "unless it gives a statement of reasons 'articulat[ing] the analysis utilized to justify upsetting [the] jury's verdict.'" *Frumkin v. Mayo Clinic,* 965 F.2d 620, 624 (8th Cir.1992) (quoting

*Stafford v. Neurological Medicine, Inc.,* 811 F.2d 470, 474 (8th Cir.1987)).

### Application of the Standard for New Trial to This Case

In light of the evidence presented to the jury, as well as the inferences a reasonable jury could draw from the evidence, there was substantial evidence supporting the jury's verdict in favor of the plaintiff. However, as explained above, there was a miscarriage of justice impacting the amount of damages awarded. For the reasons discussed above, primarily the unfair prejudice from the behavior of witness Bunch, the ineffectiveness of the instruction to disregard, the degree of reprehensibility of defendant's conduct and the irrationally large damages awarded, a miscarriage of justice would result if the damages awarded by the jury were allowed to stand. In view of the interrelationship between the evidence on liability and the evidence on damages, it would make no sense to grant a new trial just on damages.

Therefore, if judgment as a matter of law had not been granted, defendant's Motion for a New Trial would have been granted.

## IV.

### MOTION FOR REMITTITUR

Remittitur is used when a damage award is so excessive it shocks the conscience of the court. *Triton Corp. v. Hardrives, Inc.,* 85 F.3d 343, 347 (8th Cir. 1996).

For the reasons stated in this opinion, the jury's award of $185,000 in compensatory damages and $800,000 in punitive damages is so excessive that it shocks the conscience of this court. For the reasons discussed in connection with the Motion for Judgment As a Matter of Law, the jury could not reasonably award more than $50,000 in compensatory damages and the jury could not reasonably have awarded more than $100,000 in punitive damages.

Therefore, plaintiff can accept a remittitur of compensatory damages to $50,000 and a remittitur of punitive damages to $100,000 as an alternative to the granting of defendant's Motion for a New Trial.

## V.

### CONCLUSION

Accordingly it is ORDERED that:

1) defendant's Motion for Judgment as a Matter of Law is granted in part and denied in part;

2) defendant's Motion for Judgment As a Matter of Law is granted by vacating all but $50,000 of the compensatory damage award and all but $100,000 of the punitive damage award;

3) in the alternative, defendant's Motion for a New Trial is granted unless plaintiff accepts the remittitur; and

4) defendant's Motion for Remittitur is granted. If, within 12 days after the order granting in part defendant's judgment as a matter of law is vacated finally by an appellate court, plaintiff accepts the remittitur of compensatory damages to $50,000 and of punitive damages to $100,000, the defendant's Motion for a New Trial is denied. Acceptance of remittitur must be in writing, signed by plaintiff and her counsel and filed with the Clerk of the Court. If plaintiff does not accept the ordered remittitur, defendant's Motion for a New Trial is granted.